TONY WEST
Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

SANDRA SCHRAIBMAN
Assistant Director, Federal Programs Branch

ALICIA N. ELLINGTON
JOHN K. THEIS
Trial Attorneys, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm. 7226
Washington, D.C.  20530
Telephone: (202) 305-8550
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov
Alicia.N.Ellington@usdoj.gov

*Attorneys for Defendants the United States of America,*
*ATF, U.S. Attorney General Eric Holder,*
*Acting ATF Director B. Todd Jones, and*
*Assistant ATF Director Arthur Herbert,*
*in their official capacities (collectively, the United States)*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| S. ROWAN WILSON, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:11-CV-1679-GMN-(PAL) |
| | ) |
| ERIC HOLDER, Attorney General of the United States et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## THE UNITED STATES'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, Defendants the

United States of America, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and

the individual defendants in their official capacities (collectively, the United States), by their

undersigned counsel, hereby move this Court to dismiss Plaintiff's Complaint or, in the

alternative, to enter summary judgment for Defendants.  A Memorandum of Points and

Authorities accompanies this motion, along with an Appendix of Secondary Material and a

Statement of Undisputed Material Facts.

Dated: February 3, 2012                    Respectfully submitted,

                                           TONY WEST
                                           Assistant Attorney General

                                           DANIEL G. BOGDEN
                                           United States Attorney

                                           SANDRA SCHRAIBMAN
                                           Assistant Director

                                           */s/ Alicia N. Ellington*
                                           ALICIA N. ELLINGTON
                                           JOHN K. THEIS
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W., Rm. 7226
                                           Washington, D.C.  20530
                                           Telephone: (202) 305-8550
                                           Facsimile: (202) 616-8460
                                           Alicia.N.Ellington@usdoj.gov
                                           John.K.Theis@usdoj.gov


                                           *Attorneys for Defendants the United States of*
                                           *America, ATF, U.S. Attorney General Eric Holder,*
                                           *Acting ATF Director B. Todd Jones, and*
                                           *Assistant ATF Director Arthur Herbert,*
                                           *in their official capacities (collectively, the United*
                                           *States)*

2

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION .............................................................................................................2

BACKGROUND ..............................................................................................................3

I.      THE GUN CONTROL ACT AND THE CONTROLLED SUBSTANCES ACT.............3

II.     NEVADA'S LAW REGARDING THE MEDICAL USE OF MARIJUANA ..................5

III.    ATF'S SEPTEMBER 2011 OPEN LETTER TO FFLS...........................................8

IV.     PLAINTIFF'S COMPLAINT.......................................................................................10

ARGUMENT ...................................................................................................................11

I.      PLAINTIFF'S SECOND AMENDMENT RIGHTS HAVE NOT BEEN
        VIOLATED .........................................................................................................11

        A.      As Applied to Plaintiff, 18 U.S.C. § 922(g)(3), as Implemented and
                Interpreted by ATF, Does Not Violate the Second Amendment ........................12

                1.      Plaintiff's Second Amendment Challenge to § 922(g)(3) Is
                        Foreclosed By the Ninth Circuit's Decision in Dugan .............................12

                2.      Unlawful Drug Users Fall Outside the Scope of the Second
                        Amendment as Understood at the Adoption of the Bill of Rights.............15

                3.      In Any Event, As Applied to Marijuana Users, 18 U.S.C.
                        § 922(g)(3) Substantially Relates to the Important
                        Governmental Interest in Protecting Public Safety and
                        Combating Violent Crime........................................................................20

        B.      As Applied to Plaintiff, 18 U.S.C. § 922(d)(3), as Implemented and
                Interpreted by ATF, Does Not Violate the Second Amendment ........................27

II.     PLAINTIFF'S RIGHT TO EQUAL PROTECTION HAS NOT BEEN
        VIOLATED .........................................................................................................29

III.    PLAINTIFF MAY NOT PURSUE CLAIMS FOR MONETARY RELIEF
        AGAINST THE UNITED STATES, ATF, OR THE INDIVIDUAL
        DEFENDANTS IN THEIR OFFICIAL CAPACITIES. ................................................30

IV.     PLAINTIFF'S CONSPIRACY CLAIM AGAINST THE UNITED STATES
        MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION. .........31

CONCLUSION……………………………………………………………………..33

i

1

2

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                    <u>PAGE(S)</u>

<u>Azpilcueta v. State of Nev. ex rel. Transp. Auth.,</u>
    2010 WL 2871073 (D. Nev. 2010) ................................................................ 33

<u>Balser v. Department of Justice, Office of U.S. Trustee,</u>
    327 F.3d 903 (9th Cir. 2003) ........................................................................ 30

<u>Bell Atlantic Corp. v. Twombly,</u>
    550 U.S. 544 (2007) ..................................................................................... 33

<u>Bolling v. Sharpe,</u>
    347 U.S. 497 (1954) ..................................................................................... 29

<u>Boorman v. Nev. Mem'l Cremation Soc'y, Inc.,</u>
    772 F. Supp. 2d 1309 (D. Nev. 2011) ........................................................... 33

<u>Buzz Stew, LLC v. City of N. Las Vegas,</u>
    181 P.3d 670 (Nev. 2008) ............................................................................ 33

<u>City of Cleburne v. Cleburne Living Center, Inc.,</u>
    473 U.S. 432 (1985) ..................................................................................... 29

<u>Dep't of Army v. Blue Fox, Inc.,</u>
    525 U.S. 255 (1999) ..................................................................................... 30

<u>Dickerson v. New Banner Inst.,</u>
    460 U.S. 103 (1983) ....................................................................................... 4

<u>District of Columbia v. Heller,</u>
    554 U.S. 570 (2008) .............................................................................. <u>passim</u>

<u>Dyer v. U.S.,</u>
    166 F. App'x 908 (9th Cir. 2006) ................................................................. 31

<u>Fire Equip. Mfrs. Ass'n v. Marshall,</u>
    679 F.2d 679 (7th Cir. 1982) ....................................................................... 29

<u>GES, Inc. v. Corbitt,</u>
    21 P.3d 11 (Nev. 2001) ................................................................................ 33

<u>Gonzales v. Raich,</u>
545 U.S. 1 (2005)………………………………………………………..5, 15

<u>Gonzalez-Medina v. Holder,</u>
    641 F.3d 333 (9th Cir. 2011) .................................................................. 29,30

<u>Hamrick v. Brusseau,</u>
    80 F. App'x 116, 116 (D.C. Cir. 2003) ........................................................ 31

ii

Heller v. District of Columbia ("Heller II"),
   __F.3d __, 2011 WL 4551558 (D.C. Cir. Oct. 4, 2011) ............................ 19, 21

Huddleston v.United States,
   415 U.S. 814 (1974) ............................................................................. 22, 23

Jordan v. State ex rel. Dep't of Motor Vehicles & Pub. Safety,
   110 P.3d 30 (Nev. 2005) ............................................................................. 32

Lane v. Pena,
   518 U.S. 187 (1996) ..................................................................................... 31

Levin v. United States,
   663 F.3d 1059 (9th Cir. 2011) ............................................................... 30, 32

Marin Alliance for Medical Marijuana v. Holder,
   __ F.2d __, 2011 WL 5914031 (N.D. Cal. Nov. 28, 2011) .......................... 30

McDonald v. City of Chicago,
   130 S. Ct. 3020 (2010) ................................................................................ 13

Mont. Caregivers Ass'n v. United States,
   2012 WL 169771(D. Mont. Jan. 20, 2012)................................................... 15

Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales,
   468 F.3d 826 (D.C. Cir. 2006) ..................................................................... 28

Nixon v. Shrink Mo. Gov't PAC,
   528 U.S. 377 (2000).....................................................................................22

Nordyke v. King,
   644 F.3d 776 (9th Cir. 2011) ....................................................................... 20

Peruta v. Cnty. of San Diego,
   758 F. Supp. 2d 1106 (S.D. Cal. 2010)………………………………………21

Raich v. Gonzales ("Raich II"),
   500 F.3d 850 (9th Cir. 2007) ....................................................................... 14

Robertson v. Baldwin,
   165 U.S. 275 (1897)..................................................................................... 16

Rutan v. Republican Party of Ill.,
   497 U.S. 62 (1990)....................................................................................... 16

Schall v. Martin,
   467 U.S. 253 (1984)..................................................................................... 21

State v. Shelby,
   90 Mo. 302 (Mo. 1886)................................................................................ 19

iii

Stormans, Inc. v. Selecky,
    586 F.3d 1109 (9th Cir. 2009) .................................................................... 21

Tucson Airport Authority v. General Dynamics Corp.,
    136 F.3d 641 (9th Cir. 1998) ..................................................................... 31

Turner Broad. Sys. v. FCC,
    512 U.S. 622 (1994).......................................................................... 22, 26

United States v. 12 200-Foot Reels of Super 8 mm
    413 U.S. 123 (1973).................................................................................27

United States v. Carter,
    __ F.3d __ No. 09-5074, slip op. at 7–8 (4th Cir. Jan. 23, 2012) ................................... passim

United States v. Chafin,
    423 F. App'x 342 (4th Cir. Apr. 13, 2011) ................................................... 27

United States v. Chester,
    628 F.3d 673 (4th Cir. 2010) ..................................................................... 19

United States v. Dugan,
    657 F.3d 998 (9th Cir. 2011) ............................................................... passim

United States v. Hendrix,
    2010 WL 1372663 (W.D. Wis. Apr. 6, 2010) ............................................. 13, 19

United States v. Korbe,
    2010 WL 2404394 (W.D. Pa. June 9, 2010)……………………………………………13

United States v. Miller,
    604 F. Supp. 2d 1162 (W.D. Tenn. 2009)...................................................... 26

United States v. Oakland Cannabis Buyers' Coop.,
    532 U.S. 483 (2001)................................................................................. 5

United States v. Patterson,
    431 F.3d 832 (5th Cir. 2005) ..................................................................... 13

United States v. Reese,
    627 F.3d 792 (10th Cir. 2010) .................................................................... 21

United States v. Rene E.,
    583 F.3d 8 (1st  Cir. 2009))....................................................................... 19

United States v. Richard,
    350 F. App'x 252 (10th Cir. 2009)............................................................... 13

United States v. Salerno,
    481 U.S. 739 (1987)................................................................................ 21

United States v. Seay,
    620 F.3d 919 (8th Cir. 2010) ........................................................... 13

United States v. Skoien,
    614 F.3d 638 (7th Cir. 2010) ........................................... 16, 18, 26

United States v. Smith,
    499 U.S. 160 (1991) ........................................................................ 32

United States v. Stacy,
    2010 WL 4117276 (S.D. Cal. Oct. 18, 2010) ............................... 15

United States v. Tooley,
    717 F. Supp. 2d 580 (S.D. W.Va. 2010) ............................ 17, 18, 26

United States v. Vongxay,
    594 F.3d 1111 (9th Cir. 2010) ....................................................... 19

United States v. Yancey,
    621 F.3d 681 (7th Cir. 2010) ................................................. passim

Wilson v. Drake,
    87 F.3d 1073 (9th Cir. 1996)………………………………………...32

### UNITED STATES CONSTIUTION

U.S. Const. amend. II ............................................................................. 12

U.S. Const. amend. XIV, § 1 ................................................................. 29

### STATUTES

5 U.S.C. § 702 ........................................................................................ 31

18 U.S.C. § 922(d)(3) ..................................................................... passim

18 U.S.C. § 922(g) ................................................................................ 3,13

18 U.S.C. § 922(g)(3) ..................................................................... passim

21 U.S.C. § 802 ..................................................................................... 4,5

21 U.S.C. § 802(6) .................................................................................. 23

21 U.S.C. § 812 ....................................................................................... 4

21 U.S.C. § 812(b)(1) ......................................................................... 5, 14

v

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

21 U.S.C. § 812(c) ...................................................................................... 5

21 U.S.C. § 823(f) ....................................................................................... 5

21 U.S.C. § 829 ...................................................................................... 5,14

21 U.S.C. § 844(a) ................................................................................. 5,15

28 U.S.C. § 2675(a) ................................................................................... 32

28 U.S.C. § 2679(d)(1) .............................................................................. 32

28 U.S.C. 2680(a) ...................................................................................... 33

The Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220 ........................... 3

Firearm Owners' Protection Act, Pub. L. 99-308, 100 Stat. 449, 452 (1986) ............................. 23

## RULES AND REGULATIONS

27 C.F.R. § 478.11 ...................................................................................... passim

27 C.F.R. § 478.124 ....................................................................................... 9

Notice of Denial of Petition, 76 Fed. Reg 40552 (July 8, 2011) ..................................... 5

## STATE LAWS

Ala. Code § 13A-11-72(b)…………………………………………………………23

Ark. Code Ann. § 5-73-309(7), (8) ............................................................. 23

Cal. Penal Code § 12021(a)(1) .................................................................. 23

Colo. Rev. Stat. § 18-12-203(1) ................................................................ 23

Del. Code Ann. tit. 11, § 1448(a)(3) ......................................................... 23

D.C. Code § 22-4503(a)(4) ....................................................................... 23

Fla. Stat. § 790.25(2)(b)(1) ....................................................................... 23

Ga. Code Ann. § 16-11-129(b)(2)(F), (I), (J) ............................................. 23

Haw. Rev. Stat. § 134-7(c)(1) ................................................................... 23

Idaho Code Ann. § 18-3302(1)(e) .............................................................. 23

720 Ill. Comp. Stat. 5/24-3.1(a)(3) ........................................................... 23

Ind. Code § 35-47-1-7(5) .......................................................................... 23

Kan. Stat. Ann. § 21-4204(a)(1) ..............................................................23

Ky. Rev. Stat. Ann. § 237.110(4)(d), (e) ...................................................23

Md. Code Ann., Public Safety, 5-133(b)(4), (5)..........................................23

Mass. Gen. Laws ch. 140, § 129B(1).........................................................23

Minn. Stat. § 624.713(1)(10)(iii)................................................................23

Mo. Rev. Stat. § 571.070(1)(1) ..................................................................23

Nev. Rev. Stat. § 202.360(1)(c)..............................................................6, 23

Nev. Rev. Stat. § 202.360(3)(a)...............................................................6, 23

Nev. Rev. Stat. §§ 453.336.............................................................................5

Nev. Rev. Stat. Ch. 453A................................................................................6

Nev. Rev. Stat. § 453A.050..............................................................................7

Nev. Rev. Stat. § 453A.200(1)(f)....................................................................6

Nev. Rev. Stat. § 453A.200(3)........................................................................6

Nev. Rev. Stat. § 453A.210(2).......................................................................25

Nev. Rev. Stat. § 453A.210(2)(a)..........................................................6, 7, 25

Nev. Rev. Stat. § 453A.220(4)........................................................................7

Nev. Rev. Stat. § 453A.230..............................................................................7

Nev. Rev. Stat. § 453A.240..............................................................................7

Nev. Rev. Stat. § 453A.300(1)........................................................................6

N.H. Rev. Stat. Ann. § 159:3(b)(3)...............................................................23

N.J. Stat. Ann. § 2C:58-3(c)(2)....................................................................23

N.C. Gev. Stat. § 14-404(c)(3)......................................................................23

Ohio Rev. Code Ann. § 2923.13(A)(4).........................................................23

R.I. Gen. Laws § 11-47-6..............................................................................23

S.C. Code Ann. § 16-23-30(A)(1) ...............................................................23

vii

S.D. Codified Laws § 23-7-7.1(3) ........................................................................ 23

W. Va. Code § 61-7-7(a)(2), (3)…………………………………………………23

## LEGISLATIVE MATERRIAL

114 Cong. Rec. 21657, 21784 (1968)................................................................... 23

H.R. Rep. No. 90-1577, at 7 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4411 ..................... 22

S. Rep. No. 90-1501, at 22 (1968) ....................................................................... 22

## MISCELLANEOUS

1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1698)....................................17

2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) ..........................17

Joyce Lee Malcolm, To Keep and Bear Arms 123 (1994)    17

Bureau of Justice Statistics, Drugs and Crime Facts at 3 .................................... 24

National Institute of Drug Abuse, Topics in Brief: Marijuana, at 1 (Dec. 2011) ...................... 25

Nev. State Health Div., Important Notice  (Feb. 12, 2009),
http://health.nv.gov/PDFs/MMP/ImportantNotice.pdf ...........................................7

Nev. State Health Div., Program Facts (Feb. 12, 2009),
http://health.nv.gov/PDFs/MMP/ProgramFacts.pdf .............................................8

Nev. State Health Div., Medical Marijuana, Frequently Asked Questions, No. 8,
http://health.nv.gov/MedicalMarijuana_FAQ.htm .............................................8

ONDCP, ADAM II 2010 Annual Report, at 20........................................................ 24

ONDCP, Fact Sheet: Marijuana Legalization, at 1 (Oct. 2010) ...................................... 24

Robert E. Shalhope, The Armed Citizen in the Early Republic, 49 Law & Contemp. Probs.
125, 130 (1986)................................................................................... 18

Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law & Contemp. Probs. 143,
146 (1986)........................................................................................ 19

Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An
Analytical Framework and Research Agenda, 56 UCLA L. Rev.
1443, 1497 (2009)................................................................................. 18

Patrick J. Charles, "Arms for Their Defence"?: An Historical, Legal, and Textual Analysis
of the English Right to Have Arms and Whether the Second Amendment
Should Be Incorporated in McDonald v. City of Chicago, 57 Clev. State L.
Rev. 351, 373, 376, 382-83, 405 (2009).......................................... 17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TONY WEST
Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

SANDRA SCHRAIBMAN
Assistant Director, Federal Programs Branch

ALICIA N. ELLINGTON
JOHN K. THEIS
Trial Attorneys, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm. 7226
Washington, D.C.  20530
Telephone: (202) 305-8550
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov
Alicia.N.Ellington@usdoj.gov

*Attorneys for Defendants the United States of America,
ATF, U.S. Attorney General Eric Holder,
Acting ATF Director B. Todd Jones, and
Assistant ATF Director Arthur Herbert,
in their official capacities (collectively, the United States)*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| S. ROWAN WILSON,           )<br>                      )<br>       Plaintiff,     )<br>                      )<br>       v.             )<br>                      )<br>ERIC HOLDER, Attorney General of the )<br>United States <u>et al.</u>,     )<br>                      )<br>       Defendants.     )<br>                      ) | Case No.: 2:11-CV-1679-GMN-(PAL) |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'S**
**MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**INTRODUCTION**

One provision of the Gun Control Act of 1968, as amended—18 U.S.C. § 922(g)(3)—prohibits an unlawful user of a controlled substance from possessing a firearm, while another provision—18 U.S.C. § 922(d)(3)—makes it unlawful to sell a firearm while knowing or having reasonable cause to believe that the purchaser is an unlawful user of a controlled substance. Under the Controlled Substances Act, marijuana is classified as a Schedule I controlled substance that cannot be lawfully prescribed and that the general public may not lawfully possess. Although a number of states, including Nevada, have exempted from state criminal prosecution certain individuals who use marijuana for medical purposes,[1] these state laws do not alter the fact that marijuana possession remains prohibited under federal law. To advise federal firearms licensees ("FFLs") of this basic fact, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") issued an Open Letter to all FFLs on September 21, 2011, stating that "any person who uses . . . marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use for medicinal purposes, is an unlawful user of . . . a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition." See Compl., Ex. 2-B. The Open Letter further informed FFLs that "if you are aware that the potential transferee is in possession of a card authorizing the possession and use of marijuana under State law, then you have 'reasonable cause to believe' that the person is an unlawful user of a controlled substance" and "you may not transfer firearms or ammunition to the person." Id. (quoting 18 U.S.C. § 922(d)(3)).

Alleging that she possesses a medical marijuana registry card issued by the State of Nevada and has been prevented from purchasing a handgun, Plaintiff S. Rowan Wilson claims that 18 U.S.C. § 922(g)(3), 18 U.S.C. § 922(d)(3), an ATF regulation defining certain statutory

---

[1] As discussed herein, see infra at 5, the federal government does not recognize a medical use for marijuana. Any use in this memorandum of terms such as "medical use" or "for medical purposes" should not be read to suggest otherwise.

2

terms, and ATF's September 2011 Open Letter "prohibit[] a certain class of law-abiding, responsible citizens from exercising their right to keep and bear arms" and therefore violate the Second Amendment and the equal protection component of the Fifth Amendment's Due Process Clause.  Compl. ¶ 3.  Plaintiff seeks a declaratory judgment, a permanent injunction, and monetary damages, but she has failed to state a claim for which relief can be granted.

First, Plaintiff's claim that § 922(g)(3) violates her Second Amendment rights must fail because the Ninth Circuit has already rejected a Second Amendment challenge to this provision, see United States v. Dugan, 657 F.3d 998 (9th Cir. 2011), and that constitutional analysis is not altered when the provision is applied to prohibit firearm possession by someone who uses marijuana in accordance with state law but in violation of federal law.  Second, because it is consistent with the Second Amendment to prohibit any and all unlawful drug users from possessing firearms and because the Second Amendment does not convey a right to sell firearms, there can be no Second Amendment violation as a result of § 922(d)(3)'s ban on selling firearms to someone the seller knows or has reasonable cause to believe is an unlawful drug user, including those who possess a state-issued medical marijuana card as a result of having affirmatively registered to use marijuana.  Third, Plaintiff's equal protection claim fails because she is not similarly situated to persons who are not violating federal law by using marijuana. And finally, even if Plaintiff had stated a claim against the federal government, no waiver of sovereign immunity allows her to recover monetary damages from the United States, whether for her constitutional damages claims or her conspiracy claim.   Accordingly, the Complaint should be dismissed in its entirety.

**BACKGROUND**

**I.    THE GUN CONTROL ACT AND THE CONTROLLED SUBSTANCES ACT**

The Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220, included a provision—now codified at 18 U.S.C. § 922(g)—designed "to keep firearms out of the hands of presumptively risky people," including felons, the mentally ill, fugitives from justice, and

1   unlawful drug users.  Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 112 n.6 (1983).

2   Specifically, as applied to unlawful drug users, § 922(g)(3) provides that

3           [i]t shall be unlawful for any person . . . who is an unlawful user of or addicted to
            any controlled substance (as defined in section 102 of the Controlled Substances
4           Act (21 U.S.C. § 802)) . . . to . . . possess in or affecting commerce, any firearm or
            ammunition; or to receive any firearm or ammunition which has been shipped or
5           transported in interstate or foreign commerce.

6   18 U.S.C. § 922(g)(3).  To help effectuate the firearm exclusions in § 922(g), Congress also

7   banned selling firearms to the same categories of presumptively risky people; as relevant here,

8   § 922(d)(3) makes it

9           unlawful for any person to sell or otherwise dispose of any firearm or ammunition
            to any person knowing or having reasonable cause to believe that such person . . .
10          is an unlawful user of or addicted to any controlled substance (as defined in
            section 102 of the Controlled Substances Act (21 U.S.C. § 802)).
11

12  Id. § 922(d)(3).

13          In addition to challenging the constitutionality of these two provisions, Plaintiff also

14  targets 27 C.F.R. § 478.11, a regulation issued by ATF to define certain statutory terms.

15  Specifically, the regulation defines an "[u]nlawful user of or addicted to any controlled

16  substance" as

17          [a] person who uses a controlled substance and has lost the power of self-control
            with reference to the use of the controlled substance; and any person who is a
18          current user of a controlled substance in a manner other than as prescribed by a
            licensed physician.  Such use is not limited to the use of drugs on a particular day,
19          or within a matter of days or weeks before, but rather that the unlawful use has
            occurred recently enough to indicate that the individual is actively engaged in
20          such conduct.   A person may be an unlawful current user of a controlled
            substance even though the substance is not being used at the precise time the
21          person seeks to acquire a firearm or receives or possesses a firearm.  An inference
            of current use may be drawn from evidence of a recent use or possession of a
22          controlled substance or a pattern of use or possession that reasonably covers the
            present time . . . .
23

24  27 C.F.R. § 478.11.  Additionally, the regulation echoes §§ 922(g)(3) and 922(d)(3) by providing

25  that a "controlled substance" is "[a] drug or other substance, or immediate precursor, as defined

26  in section 102 of the Controlled Substances Act, 21 U.S.C. § 802." Id.

27

28
                                                    4

Section 102 of the Controlled Substances Act, in turn, defines "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter [21 U.S.C. § 812]."  21 U.S.C. § 802(6).  Since the enactment of the Controlled Substances Act, marijuana (also known as cannabis) has been classified as a Schedule I drug.  21 U.S.C. § 812(c), Schedule I(c)(10).  By classifying marijuana as a Schedule I drug, Congress has determined that marijuana "has a high potential for abuse," that it "has no currently accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted safety for use of [marijuana] under medical supervision."  Id. § 812(b)(1).[2]  As such, Schedule I drugs, including marijuana, cannot be legally prescribed for medical use.  See 21 U.S.C. § 829; see also United States v. Oakland Cannabis Buyers' Coop., 532 U.S. 483, 491 (2001) ("Whereas some other drugs can be dispensed and prescribed for medical use, . . . the same is not true for marijuana.").  Additionally, it is generally unlawful for any person to knowingly or intentionally possess marijuana.  See 21 U.S.C. § 844(a).  For Schedule I drugs like marijuana, the only exception to this ban on possession is for a federally approved research project.  See id. § 823(f); see also Gonzales v. Raich, 545 U.S. 1, 14 (2005) ("By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the . . . possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study.").

## II.   NEVADA'S LAW REGARDING THE MEDICAL USE OF MARIJUANA

Separate and apart from federal law, the State of Nevada also criminalizes the possession of marijuana.  See Nev. Rev. Stat. § 453.336.  In 2000, however, Nevada's Constitution was

---

[2] The Controlled Substances Act delegates authority to the Attorney General to reschedule controlled substances after consulting with the Secretary of Health and Human Services.  Id. § 811.  The Department of Justice's Drug Enforcement Agency ("DEA") has repeatedly denied petitions to have marijuana removed from schedule I, most recently in 2011.  See Notice of Denial of Petition, 76 Fed. Reg. 40552 (July 8, 2011); see also Gonzales v. Raich, 545 U.S. 1, 15 & n.23 (2005).  Based largely on scientific and medical evaluations prepared by the Department of Health and Human Services, DEA has consistently found that marijuana continues to meet the criteria for schedule I control.  See 76 Fed. Reg. at 40552.

amended by initiative petition to add the following provision regarding the medical use of

marijuana:

> The legislature shall provide by law for . . . [t]he use by a patient, upon the advice of his physician, of a plant of the genus Cannabis for the treatment or alleviation of cancer, glaucoma, acquired immunodeficiency syndrome; severe, persistent nausea of cachexia resulting from these or other chronic or debilitating medical conditions; epilepsy and other disorders characterized by seizure; multiple sclerosis and other disorders characterized by muscular spasticity; or other conditions approved pursuant to law for such treatment.

Nev. Const. art. IV, § 38(1)(a).  Pursuant to this constitutional amendment, Nevada enacted

legislation in 2001 that exempts the medical use of marijuana from state prosecution in certain

circumstances.  See Nev. Rev. Stat. Ch. 453A.  Subject to certain exceptions, the law provides

that "a person who holds a valid registry identification card . . . is exempt from state prosecution

for . . . [a]ny . . . criminal offense in which the possession, delivery or production of marijuana

. . . is an element."  Nev. Rev. Stat. § 453A.200(1)(f).[3]  This exemption only applies to the extent

that the holder of a registry identification card (i) engages in "the medical use of marijuana in

accordance with the provisions of this chapter as justified to mitigate the symptoms or effects of

the person's chronic or debilitating medical condition;" and (ii) "[d]o[es] not, at any one time,

collectively possess, deliver or produce more than . . . [o]ne ounce of usable marijuana[,] [t]hree

mature marijuana plants[,] and [f]our immature marijuana plants."  Id. § 453A.200(3).

     The law also specifies who is eligible to receive a state-issued registry identification card,

requiring applicants to provide, inter alia, "[v]alid, written documentation from the person's

attending physician stating that . . . [t]he person has been diagnosed with a chronic or debilitating

medical condition."  Id. § 453A.210(2)(a)(1).[4]  The applicant must also provide documentation

---

[3] The statute specifies, however, that cardholders are not exempt from state prosecution for a number of other crimes related to marijuana use.  Id. § 453A.300(1).  In addition, a separate provision of Nevada law specifies that "[a] person shall not own or have in his or her possession or under his or her custody or control any firearm if the person . . . [i]s an unlawful user of, or addicted to, any controlled substance," and defines the term "controlled substance" by reference to the federal Controlled Substances Act.  Nev. Rev. Stat. § 202.360(1)(c), (3)(a).

[4] The statute defines the term "chronic or debilitating medical condition" to include AIDS, cancer, and glaucoma, as well as "[a] medical condition or treatment for a medical condition that

*(Footnote continued on following page.)*

6

from his or her physician stating that "[t]he medical use of marijuana may mitigate the symptoms or effects of that condition" and that "[t]he attending physician has explained the possible risks and benefits of the medical use of marijuana." Id. § 453A.210(2)(a)(2)–(3).  The state-issued registry identification card is valid for one year and must be renewed by annually submitting updated written documentation from the cardholder's attending physician, including proof that the individual continues to suffer from a chronic or debilitating medical condition.  Id. §§ 453A.220(4), 453A.230.  If a cardholder is "diagnosed by the person's attending physician as no longer having a chronic or debilitating medical condition, the person . . . shall return the[] registry identification card[] to the [State] within 7 days after notification of the diagnosis." Id. § 453A.240.

Nevada's law governing the medical use of marijuana does not purport to "legalize" medical marijuana, but rather specifies the limited circumstances under which the possession of limited amounts of marijuana for medical use is exempt from state prosecution.  This fact is evidenced by the overall structure of the statute, as well as by the act's inclusion of a directive instructing the next session of the Nevada legislature to "review statistics provided by the legislative counsel bureau with respect to . . . [w]hether persons exempt from state prosecution [under] this act have been subject to federal prosecution for carrying out the activities concerning which they are exempt from state prosecution pursuant to [the act]."  Act of June 14, 2001 (Assembly Bill 453), ch. 592, § 48.5.  Along these lines, a one-page "Important Notice" posted on the State of Nevada's Department of Health and Human Services, Health Division's website advises the public that "**ISSUANCE OF A STATE OF NEVADA MEDICAL MARIJUANA REGISTRY CARD DOES NOT EXEMPT THE HOLDER FROM PROSECUTION UNDER FEDERAL LAW**."  See Nev. State Health Div., Important Notice (Feb. 12, 2009),

---

produces, for a specific patient," one or more of the following symptoms: (i) cachexia, (ii) persistent muscle spasms, (iii) seizures, (iv) severe nausea, or (v) severe pain.  Id. § 453A.050.

1   http://health.nv.gov/PDFs/MMP/ImportantNotice.pdf (emphasis in original) [App.[5] at Tab 1]; see

2   also Nev. State Health Div., Program Facts 2 (Feb. 12, 2009),

3   http://health.nv.gov/PDFs/MMP/ProgramFacts.pdf [App. at Tab 2] (stating, in a two-page

4   document posted on the Health Division's website, that "[t]he Medical Marijuana law is a state

5   law, offering protection from state law enforcement only" and that "[t]he federal government

6   does not recognize the state law and is not bound by it").  A section of the Nevada Health

7   Division's website answering frequently asked questions also informs the public that cardholders

8   cannot fill a prescription for medical marijuana at a pharmacy because "[t]he federal government

9   classifies marijuana as a Schedule I drug, which means licensed medical practitioners cannot

10  prescribe it."  Nev. State Health Div., Medical Marijuana, Frequently Asked Questions, No. 8,

11  http://health.nv.gov/MedicalMarijuana_FAQ.htm (last updated Sept. 29, 2011) [App. at Tab 3].

12  The frequently asked questions page also specifies that a patient may withdraw from the program

13  by submitting a written statement indicating that he or she wishes to withdraw and by returning

14  the individual's registry identification card.  Id., No. 12.

15  **III.    ATF'S SEPTEMBER 2011 OPEN LETTER TO FFLS**

16          On September 21, 2011, ATF issued an "Open Letter to All Federal Firearms Licensees."

17  See Compl., Ex. 2-B.  The Open Letter first notes that ATF "has received a number of inquiries

18  regarding the use of marijuana for medicinal purposes and its applicability to Federal firearms

19  laws" and that the "purpose of this open letter is to provide guidance on the issue and to assist

20  [FFLs] in complying with Federal firearms laws and regulations."  Id.  The Open Letter then

21  observes that "[a] number of States have passed legislation allowing under State law the use or

22  possession of marijuana for medicinal purposes" and that "some of these States issue a card

23  authorizing the holder to use or possess marijuana under State law."  Id.  The Open Letter

24  proceeds to summarize the relevant provisions of federal law, noting (i) that "18 U.S.C.

25  _____

26  [5] Pursuant to Local Rule 7-3, the United States has concurrently filed an appendix to this memorandum containing secondary materials cited herein.

27

28

§ 922(g)(3)[] prohibits any person who is an 'unlawful user of or addicted to any controlled substance . . .' from shipping, transporting, receiving or possessing firearms or ammunition;" (ii) that the Controlled Substances Act lists marijuana as a Schedule I controlled substance and that "there are no exceptions in Federal law for marijuana purportedly used for medicinal purposes, even if such use is sanctioned by State law;" (iii) that "18 U.S.C. § 922(d)(3)[] makes it unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or <u>having reasonable cause to believe</u> that such person is an unlawful user of or addicted to a controlled substance;" and (iv) that, under 27 C.F.R. § 478.11, "'an inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonable covers the present time.'"  Compl., Ex. 2-B (emphasis in original).  The Open Letter then interprets these provisions to draw two conclusions: first, "any person who uses or is addicted to marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use for medicinal purposes, is an unlawful user of or addicted to a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition."  <u>Id.</u>  Second, if an FFL is "aware that the potential transferee is in possession of a card authorizing the possession and use of marijuana under State law, then [the FFL] ha[s] 'reasonable cause to believe' that the person is an unlawful user of a controlled substance" and "may not transfer firearms or ammunition to the person."  <u>Id.</u>  This conclusion holds, the Open Letter notes, even if the potential transferee answered "no" to Question 11(e) on ATF Form 4473,[6] which asks, "Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance?"  <u>Id.</u>; <u>see also</u> Compl., Ex. 2-C.

---

[6] ATF Form 4473 is a firearms transaction record that all potential purchasers are required to complete before receiving a firearm from an FFL.  <u>See</u> 27 C.F.R. § 478.124.

## IV.     PLAINTIFF'S COMPLAINT

According to the Complaint,[7] Plaintiff applied for a medical marijuana registry card from the State of Nevada in October 2010.  Compl. ¶ 35.  Since the age of ten, Plaintiff has experienced severe menstrual cramps, which she describes as "sometimes debilitating, even leading to further painful side effects, such as severe nausea and cachexia."  Compl., Ex. 1, ¶ 20. As part of her application for a registry identification card, Plaintiff "obtained a doctor's recommendation for the use of medical marijuana."  Compl. ¶ 36.  On May 12, 2011, Nevada issued a registry identification card to Plaintiff.  Id. ¶ 37; see also Compl., Ex. 1-B.

Approximately five months later, on October 4, 2011, Plaintiff visited Custom Firearms & Gunsmithing, a federally licensed gun store in Moundhouse, Nevada, to purchase a handgun. In order to effect the transaction, Plaintiff began to complete ATF Form 4473, but left Question 11(e) blank.  See Compl., Ex. 1-C.  Plaintiff alleges that her "natural inclination" was to answer "no" to Question 11(e), but that Mr. Frederick Hauseur, IV, the store's proprietor, informed her that ATF had "promulgated a policy whereby any person holding a medical marijuana registry card is automatically considered an 'unlawful user of, or addicted to marijuana.'"  Compl. ¶ 42. She states that she decided to leave the question blank because she "holds a valid medical marijuana registry card issued by the State of Nevada, but is clearly not an unlawful user of or addicted to marijuana."  Id. ¶ 43.  When Plaintiff provided the form to Mr. Hauseur, he informed her that he was prohibited from selling her any firearm or ammunition.  Compl., Ex. 1, ¶ 32.  Mr. Hauseur and Plaintiff had known each other for nearly a year, and Mr. Hauseur was previously aware that Plaintiff possessed a state-issued medical marijuana registry card.  Id.; Compl., Ex. 2, ¶ 11.  With that knowledge and having received notice of ATF's Open Letter, Mr. Hauseur determined he could not sell Plaintiff a firearm without jeopardizing his status as a FFL.  Compl., Ex. 2, ¶ 12.  Plaintiff alleges more generally that she "presently intends to acquire a functional

---

[7] The facts alleged in Plaintiff's Complaint are accepted as true for purposes of the United States's Motion to Dismiss.

10

1    handgun for use within her home for self-defense but is prevented from doing so" by federal law,

2    as implemented by ATF.  Compl. ¶ 6.

3         On October 18, 2011, Plaintiff filed a three-count Complaint against the United States,

4    ATF, U.S. Attorney General Eric Holder, ATF Acting Director B. Todd Jones, and ATF

5    Assistant Director Arthur Herbert.[8]  In Count One, Plaintiff alleges that 18 U.S.C. § 922(g)(3),

6    18 U.S.C. § 922(d)(3), 27 C.F.R. § 478.11, and ATF's September 2011 Open Letter violate her

7    right to keep and bear arms under the Second Amendment.  Compl. ¶¶ 46–51.  In Count Two,

8    Plaintiff alleges that these same "laws and policies" violate her Fifth Amendment right to equal

9    protection.  Id. ¶¶ 52–57.  In Count Three, Plaintiff raises a conspiracy claim, alleging that "[t]he

10   Defendants, and each of them, acted in concert to deprive the Plaintiff of her Second and Fifth

11   Amendment rights by enacting and enforcing the unconstitutional laws, policies, practices and/or

12   procedures complained of in this action."  Id. ¶ 59.  For relief, Plaintiff seeks a declaration "that

13   18 U.S.C. §§ 922(g)(3) and 922(d)(3) and derivative regulations, such as 27 C.F.R. § 478.11,"

14   violate the Second Amendment and the Due Process Clause of the Fifth Amendment, as well as

15   an injunction preventing the enforcement of these laws and regulations.  Compl., Prayer for

16   Relief, ¶¶ 1–3.  She also seeks compensatory and punitive damages.  Id. ¶ 4.

17                                         **ARGUMENT**

18   **I.    PLAINTIFF'S SECOND AMENDMENT RIGHTS HAVE NOT BEEN VIOLATED**

19        The Ninth Circuit has held that Congress did not violate the Second Amendment by

20   prohibiting unlawful drug users from possessing firearms.  See United States v. Dugan, 657 F.3d

21   998 (9th Cir. 2011).  This binding holding applies to all unlawful drug users, even those whose

22   marijuana use is not a crime as a matter of state law.  Even if the Ninth Circuit had not already

23   upheld 18 U.S.C. § 922(g)(3) against a Second Amendment challenge, Plaintiff's claim against

---

[8] Plaintiff names Defendants Holder, Jones, and Herbert in both their official and their individual
capacities.  A separate, contemporaneously-filed motion to dismiss by the individual defendants
addresses the specific reasons why Plaintiff's claims against these defendants in their individual
capacities must fail.

that provision would still fail because it proscribes activity that falls outside the scope of the Second Amendment's protections.  In any event, because prohibiting possession of firearms by unlawful drug users, including marijuana users, substantially relates to the important governmental interests in combatting violent crime and protecting public safety, 18 U.S.C. § 922(g)(3) does not violate Plaintiff's Second Amendment rights.  Plaintiff's challenge to § 922(d)(3) and to ATF's interpretation of that provision in the September 2011 Open Letter similarly fails.  The Second Amendment does not protect a right to sell firearms.  Moreover, because § 922(g)(3)—which prohibits unlawful drug users' firearm possession—does not violate the Second Amendment, the fact that § 922(d)(3) might prevent unlawful drug users from acquiring firearms does not render that provision constitutionally suspect.

**A.      As Applied to Plaintiff, 18 U.S.C. § 922(g)(3), as Implemented and Interpreted by ATF, Does Not Violate the Second Amendment.**

**1.      Plaintiff's Second Amendment Challenge to § 922(g)(3) Is Foreclosed By the Ninth Circuit's Decision in <u>Dugan</u>.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008), after determining that the Second Amendment confers an individual right to keep and bear arms, <u>id.</u> at 595, the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self defense," <u>id.</u> at 635.  The Court's holding was narrow and addressed only the "core" right of "<u>law-abiding, responsible</u> citizens to use arms in defense of hearth and home."  <u>Id.</u> at 634–35 (emphasis added).

The Supreme Court also took care to note that, like other constitutional rights, the right to keep and bear arms is "not unlimited."  <u>Id.</u> at 626.  Although the Supreme Court declined to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding

12

prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing conditions and qualifications on the commercial sale of arms." <u>Id.</u> at 626–27.  The Court clarified that it was "identify[ing] these presumptively lawful regulatory measures only as examples" and that its list was not "exhaustive." <u>Id.</u> at 627 n.26; <u>see also</u> <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020, 3047 (2010).

Following <u>Heller</u>, numerous Second Amendment challenges have been raised against § 922(g)(3), and not one has succeeded.  <u>See, e.g.</u>, <u>United States v. Yancey</u>, 621 F.3d 681, 683, 687 (7th Cir. 2010) (holding that § 922(g)(3) was "equally defensible" as, and analogous to, the categorical bans described as presumptively lawful in <u>Heller</u> and that "Congress acted within constitutional bounds by prohibiting illegal drug users from firearm possession because it is substantially related to the important governmental interest in preventing violent crime"); <u>United States v. Seay</u>, 620 F.3d 919, 925 (8th Cir. 2010) ("find[ing] that § 922(g)(3) is the type of 'longstanding prohibition[] on the possession of firearms' that <u>Heller</u> declared presumptively lawful"); <u>United States v. Richard</u>, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished); <u>United States v. Korbe</u>, Criminal No. 09-05, 2010 WL 2404394, at *3–4 (W.D. Pa. June 9, 2010); <u>United States v. Hendrix</u>, No. 09-cr-56-bbc, 2010 WL 1372663, at *3 (W.D. Wis. Apr. 6, 2010); <u>see also</u> <u>United States v. Patterson</u>, 431 F.3d 832, 835–36 (5th Cir. 2005) (holding, pre-<u>Heller</u>, that although the Fifth Circuit recognized an individual right to bear arms, a criminal defendant's Second Amendment challenge to § 922(g)(3) was unavailing).[9]

---

[9] <u>United States v. Carter</u>, __ F.3d __, No. 09-5074, 2012 WL 207067 (4th Cir. Jan. 23, 2012), is not to the contrary.  There, the Fourth Circuit found that the government had failed to meet its burden of establishing a record showing a reasonable fit between § 922(g)(3) and the government's important interest in public safety, and it therefore remanded to allow the government an opportunity to substantiate the record.  <u>Carter</u>, 2012 WL 207067, at *7–8.  In doing so, however, the Fourth Circuit noted that the record necessary to justify § 922(g)(3) "need not be as fulsome as that necessary to justify" other sub-sections of § 922(g) because, unlike the other sub-sections, § 922(g)(3) "only applies to persons who are <u>currently</u> unlawful users or addicts." <u>Id.</u> at *6.  Indeed, the court proceeded to observe that the government's burden on remand "should not be difficult to satisfy in this case, as the government has already asserted in argument several risks of danger from mixing drugs and guns" and noted that the Seventh Circuit in <u>Yancey</u> had "identified a number of studies demonstrating 'the connection between chronic drug abuse and violent crime.'" <u>Id.</u> at *7–8.

1     The Ninth Circuit similarly upheld § 922(g)(3) against a Second Amendment challenge in

2  Dugan.  Like the other courts to have considered the issue, the Ninth Circuit found significant

3  Heller's language indicating that § 922(g)(1)'s prohibition on firearm possession by felons and

4  § 922(g)(4)'s prohibition on firearm possession by the mentally ill were presumptively lawful.

5  Dugan, 657 F.3d at 999.  The court found that "the same amount of danger" is presented by

6  allowing habitual drug users to possess firearms because "[h]abitual drug users, like career

7  criminals and the mentally ill, more likely will have difficulty exercising self-control,

8  particularly when they are under the influence of controlled substances."  Id.  The court also

9  found an important distinction between § 922(g)(3) and the two prohibitions declared

10  presumptively lawful by Heller that actually favored § 922(g)(3)'s constitutionality—namely,

11  that "an unlawful drug user may regain his right to possess a firearm simply by ending his drug

12  abuse," whereas those individuals who have been convicted of a felony or committed to a mental

13  institution generally face a lifetime ban.  Id.  The court therefore concluded that "[b]ecause

14  Congress may constitutionally deprive felons and mentally ill people of the right to possess and

15  carry weapons, . . . Congress may also prohibit illegal drug users from possessing firearms."  Id.

16  at 999–1000.

17     Although not evident from the face of the opinion, Dugan, like Plaintiff, possessed a

18  state-issued card exempting him from state prosecution for using marijuana for medical

19  purposes.  See Brief for Appellant at 59, Dugan, 657 F.3d 998 (No. 08-10579), ECF No. 57

20  ("Here, Mr. Dugan was . . . licensed to grow and use medical marijuana.").  Indeed, the central

21  argument in Dugan's Second Amendment challenge was that "millions of Americans peacefully

22  engage in the unlawful use of marijuana—and millions more do so legally under state medical

23  marijuana laws—without engaging in any behavior that would provide a legitimate basis for

24  excluding them from the reach of the Second Amendment."  Id. at 57.  The Ninth Circuit,

25  however, treated Dugan's status as a medical marijuana cardholder as irrelevant to his Second

26  Amendment claim—and rightly so.  Congress has determined that marijuana "has no currently

27

28

14

accepted medical use in treatment in the United States," 21 U.S.C. § 812(b)(1)(B), and has

accordingly specified that it may not be validly prescribed or lawfully possessed, id. §§ 829,

844(a).  Although several states, including Nevada, have taken a different view of marijuana's

potential medical benefits, it is well settled that Congress has authority under the Commerce

Clause to criminalize marijuana possession, even if such possession is not also illegal under state

law.  See Gonzales v. Raich, 545 U.S. 1 (2005); see also Raich v. Gonzales ("Raich II"), 500

F.3d 850, 861–64 (9th Cir. 2007) (holding, on remand from the Supreme Court, that there is no

Ninth Amendment or substantive due process right to use marijuana for claimed medical

purposes); Mont. Caregivers Ass'n v. United States, __ F. Supp. 2d __, No. CV 11-74-M-DWM,

2012 WL 169771 (D. Mont. Jan. 20, 2012).  All users of marijuana are therefore unlawful users

of a controlled substance, and Dugan's holding that Congress may "prohibit illegal drug users

from possessing firearms" without violating the Second Amendment applies equally to them all.

657 F.3d at 999–1000; see also United States v. Stacy, No. 09cr3695 BTM, 2010 WL 4117276,

at *7 (S.D. Cal. Oct. 18, 2010) (noting, in the course of rejecting a Second Amendment challenge

to § 922(g)(3), that "[t]he fact that this particular case involves the alleged lawful use of

marijuana under state law does not have any bearing on the presumptively lawful nature of the

restriction").  As such, Plaintiff's claim that her Second Amendment rights have been violated by

§ 922(g)(3), as interpreted by ATF, must fail.

### 2.   Unlawful Drug Users Fall Outside the Scope of the Second Amendment as Understood at the Adoption of the Bill of Rights.

Even if Plaintiff's Second Amendment challenge to § 922(g)(3) were not foreclosed by

Dugan, it would still fail because unlawful drug users are not within the class of law-abiding,

responsible citizens historically protected by the Second Amendment.  As noted earlier, Heller's

holding was relatively narrow, recognizing only the "core" right of "law-abiding, responsible

citizens to use arms in defense of hearth and home."  554 U.S. at 634–35 (emphasis added).

Given this, as well as the Court's recognition that categorical prohibitions on firearm possession

15

by felons and the mentally ill are presumptively lawful, it is clear that <u>Heller</u>'s determination that

the Second Amendment confers an individual right to keep and bear arms cannot be

misconstrued as recognizing a right for <u>all</u> individuals to possess firearms, no matter the

circumstances.  Rather, <u>Heller</u>'s carefully crafted articulation of the right at the core of the

Second Amendment acknowledges that the Anglo-American right to arms that was incorporated

into the Bill of Rights was subject to certain well-recognized exceptions.[10]  Given the relatively

recent history of federal enactments disqualifying felons and the mentally ill from possessing

weapons,[11] <u>Heller</u> also teaches that "exclusions [from the right to bear arms] need not mirror

limits that were on the books in 1791," when the Second Amendment was enacted.  <u>United

States v. Skoien</u>, 614 F.3d 638, 641 (7th Cir. 2010) (en banc); <u>see also</u> <u>id.</u> at 640 ("[<u>Heller</u>] tell[s]

us that statutory prohibitions on the possession of weapons by some persons are proper—and . . .

that the legislative role did not end in 1791.  That <u>some</u> categorical limits are proper is part of the

original meaning, leaving to the people's elected representatives the filling in of details.").

Nevertheless, the history of the right to arms as it developed in England and the American

colonies is consistent not only with the disarmament of convicted felons and the mentally ill, but

also more broadly supports Congress's authority to prohibit firearm possession by non-law-

abiding citizens, including those who violate drug laws.

---

[10] It is "perfectly well settled" that the Bill of Rights embodies "certain guaranties and
immunities which we had inherited from our English ancestors," and "which had, from time
immemorial, been subject to certain well-recognized exceptions, arising from the necessities of
the case." <u>Robertson v. Baldwin</u>, 165 U.S. 275, 281 (1897).  The Court similarly recognized that
"[i]n incorporating these principles into the fundamental law, there was no intention of
disregarding the exceptions, which continued to be recognized as if they had been formally
expressed." <u>Id.</u>; <u>see also</u> <u>Rutan v. Republican Party of Ill.</u>, 497 U.S. 62, 95-96 (1990) (Scalia, J.,
dissenting) ("The provisions of the Bill of Rights . . . did not create by implication novel
individual rights overturning accepted political norms.").

[11] <u>See</u> <u>Skoien</u>, 614 F.3d at 640–41 ("The first federal statute disqualifying felons from possessing
firearms was not enacted until 1938 . . . . [T]he ban on possession by <u>all</u> felons was not enacted
until 1961. . . . Moreover, legal limits on the possession of firearms by the mentally ill also are of
20th Century vintage; § 922(g)(4), which forbids possession by a person 'who has been
adjudicated as a mental defective or who has been committed to a mental institution,' was not
enacted until 1968." (citations omitted)).

<u>Heller</u> identified the right protected by the 1689 English Declaration of Rights as "the predecessor to our Second Amendment."  554 U.S. at 593.  This document provided, "That the subjects which are Protestants may have arms for their defense suitable to their conditions and <u>as allowed by law</u>."  <u>Id.</u> (quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)) (emphasis added).  It is undisputed that both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous.  <u>Id.</u> at 582. Moreover, "like all written English rights," this right to arms "was held only against the Crown, not Parliament," <u>id.</u> at 593, and thus its scope was only "as allowed by law."  Significantly, the English Declaration of Rights did <u>not</u> repeal the 1662 Militia Act, which authorized lieutenants of the militia (appointed by the King) to disarm "any person or persons" judged "<u>dangerous to the Peace of the Kingdome</u>,"  13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.) (emphasis added), and "was to remain in force with only insignificant changes for many years to come," Joyce Lee Malcolm, <u>To Keep and Bear Arms</u> 123 (1994) [App. at Tab 4]; <u>accord</u> Patrick J. Charles, "<u>Arms for Their Defence</u>"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago, 57 Clev. State L. Rev. 351, 373, 376, 382–83, 405 (2009).  Since the act was employed against those viewed as "disaffected or dangerous," Charles, 57 Clev. State L. Rev. at 376–78, individuals could be disarmed without any adjudication of wrongdoing.

The documentary record surrounding the adoption of the Constitution similarly confirms that the right to keep and bear arms was limited to "law-abiding and responsible" citizens.  In other words, "it is clear that the colonists, at least in some manner, carried on the English tradition of disarming those viewed as 'disaffected and dangerous.'"  <u>United States v. Tooley</u>, 717 F. Supp. 2d 580, 590 (S.D. W.Va. 2010).  Notably, "<u>Heller</u> identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents," which "asserted that citizens have a personal right to bear arms '<u>unless for crimes committed</u>, or <u>real danger of</u>

17

public injury from individuals.'"  Skoien, 614 F.3d at 640 (quoting Heller, 554 U.S. at 604; 2
Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (emphasis added)).
"One reason for considering this proposal 'highly influential,' is that it represents the view of the
Anti-federalists – the folk advocating . . . for a strong Bill of Rights."  Tooley, 717 F. Supp. 2d at
590.  This proposal demonstrates that, at the time the Constitution was adopted, even ardent
supporters of guaranteeing an individual right to keep and bear arms recognized that criminals
and other dangerous individuals should not enjoy its benefits.  Although the Second Amendment
itself proved more "succinct[]" than the Pennsylvania proposal, Heller, 554 U.S. at 659 (Stevens,
J., dissenting), the latter remains probative of how the Amendment's supporters viewed the
balance between public security and the right to keep and bear arms.  See id. at 605 (reaffirming
that "the Bill of Rights codified venerable, widely understood liberties").

The Pennsylvania proposal, moreover, supports the view that "the right to arms does not
preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the
mentally unbalanced, are deemed incapable of virtue."  Don B. Kates & Clayton E. Cramer,
Second Amendment Limitations and Criminological Considerations, 60 Hastings L.J. 1339, 1360
(2009); see also Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-
Defense: An Analytical Framework and Research Agenda, 56 UCLA L. Rev. 1443, 1497 (2009)
("[A]ny textual or original-meaning limitations on who possesses the right will often stem from
the perception that certain people aren't trustworthy enough to possess firearms."); id. at 1510
(opining that "those whose judgment is seen as compromised by mental illness, mental
retardation, or drug or alcohol addiction have historically been seen as less than full
rightholders"); Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American
Origins of Gun Control, 73 Fordham L. Rev. 487, 492 (2004); Robert E. Shalhope, The Armed
Citizen in the Early Republic, 49 Law & Contemp. Probs. 125, 130 (1986).  Additional historical
support for this understanding of the right is found in nineteenth-century cases upholding state
legislation restricting firearm possession by certain classes of people perceived to be dangerous.

18

For example, the Missouri Supreme Court held in 1886 that a state law prohibiting intoxicated persons from carrying firearms did not violate the state constitutional right to keep and bear arms.  State v. Shelby, 2 S.W. 468, 468–69 (Mo. 1886).

Courts interpreting the Second Amendment following Heller have recognized the importance of the Amendment's historical limitations.  See, e.g., Heller v. District of Columbia ("Heller II"), __F.3d __, 2011 WL 4551558, at *5 (D.C. Cir. Oct. 4, 2011); United States v. Chester, 628 F.3d 673 (4th Cir. 2010).  Indeed, the First Circuit recently relied, in part, on historical sources in holding that the right to keep arms does not extend to juveniles.  United States v. Rene E., 583 F.3d 8, 15-16 (1st Cir. 2009), cert. denied, 130 S. Ct. 1109 (Jan. 11, 2010). The Ninth Circuit has recognized this history as well, noting that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' . . . and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)." United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., The Second Amendment: A Dialogue, 49 Law & Contemp. Probs. 143, 146 (1986)).

This history is sufficient to resolve Plaintiff's challenge to § 922(g)(3).  Simply put, unlawful drug users—a category that includes all marijuana users—are outside the class of "law-abiding, responsible" citizens historically protected by the Second Amendment.  Because the right to keep arms does not extend to those who are actively engaged in illegal activity, § 922(g)(3), as interpreted by ATF, cannot violate the Second Amendment.  See Hendrix, 2010 WL 1372663, at *3 ("Preventing criminal users of controlled substances from possessing guns is not a restriction on the values that the Second Amendment protects, which, to repeat, is the right of law-abiding citizens to possess handguns in their homes for self-protection.").

3. **In Any Event, As Applied to Marijuana Users, 18 U.S.C. § 922(g)(3) Substantially Relates to the Important Governmental Interest in Protecting Public Safety and Combating Violent Crime.**

Even if the Court declines to reach the issue of whether unlawful drug users fell outside the scope of the Second Amendment as understood at the time of its adoption, it should still uphold § 922(g)(3), as applied to all marijuana users, because the statute easily survives heightened review.  In Heller, the Supreme Court did not specify which standard of review should be applied in Second Amendment cases, other than to rule out use of rational-basis scrutiny.  554 U.S. at 628 & n.27.  This question is still unsettled in the Ninth Circuit: a panel of that court recently took a step towards resolving the issue, holding that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment," although declining to decide "precisely what type of heightened scrutiny applies to laws that substantially burden Second Amendment rights."  Nordyke v. King, 644 F.3d 776, 786 & n.9 (9th Cir. 2011).  The Ninth Circuit has decided to rehear that case en banc, however, and the panel opinion has been stripped of precedential force.  Nordyke, No. 07-15763, 2011 WL 5928130 (9th Cir. Nov. 28, 2011).  The other courts of appeals that have addressed the standard-of-review issue have uniformly concluded that this type of regulation is, at most, subject to intermediate scrutiny.  The Fourth Circuit, for example, recently declined to decide whether firearm possession by unlawful drug users was understood to be within the scope of the Second Amendment's guarantee at the time of ratification, but then rejected the defendant's claim that strict scrutiny should apply to his challenge because he purchased the guns at issue for self-defense in the home.  United States v. Carter, __ F.3d __, No. 09-5074, 2012 WL 207067, at *4 (4th Cir. Jan. 23, 2012).  Instead, the court applied intermediate scrutiny, explaining that "[w]hile we have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in Heller, that core right is only enjoyed, as Heller made clear, by 'law-abiding, responsible citizens,'" which unlawful drug users "cannot claim to be."  Id.  The court noted that it was "join[ing] the other courts of appeals that have rejected the application of strict

20

scrutiny in reviewing the enforcement of § 922(g)(3), or, for that matter, any other subsection of § 922(g)." Id. at *5; see also Yancey, 621 F.3d at 683 (applying intermediate scrutiny to a § 922(g)(3) challenge); cf. United States v. Reese, 627 F.3d 792, 802 (10th Cir. 2010) (applying intermediate scrutiny to challenge to § 922(g)(8)); Heller II, 2011 WL 4551558, at *9 (applying intermediate scrutiny to review novel gun registration laws).  Given this weight of authority, intermediate scrutiny is the highest standard of review that should potentially apply here.

There can be no doubt that § 922(g)(3), as applied to marijuana users, satisfies intermediate scrutiny.  Under intermediate scrutiny, "a regulation must be substantially related to an important governmental objective."  Stormans, Inc. v. Selecky, 586 F.3d 1109, 1134 (9th Cir. 2009).  An important—indeed, compelling—governmental interest is at stake here—namely, the government's interest in protecting public safety and preventing violent crime.  See United States v. Salerno, 481 U.S. 739, 748, 750 (1987) (noting that the Supreme Court has "repeatedly held that the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and that the "[g]overnment's general interest in preventing crime is compelling"); Schall v. Martin, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."); see also Carter, 2012 WL 207067, at *5 ("We readily conclude in this case that the government's interest in 'protecting the community from crime' by keeping guns out of the hands of dangerous persons is an important governmental interest."); Yancey, 621 F.3d at 684 ("The broad objective of § 922(g)—suppressing armed violence—is without doubt an important one.").

In terms of evaluating the fit between the indisputably important objectives at stake and the prohibition in § 922(g)(3), there are several relevant considerations that affect the analysis.  First, intermediate scrutiny, "by definition, allows [the government] to paint with a broader brush" than strict scrutiny.  Peruta v. Cnty. of San Diego, 758 F. Supp. 2d 1106, 1117 (S.D. Cal. 2010) (internal quotation marks and citation omitted).  Second, in order to advance its compelling interests in combating crime and protecting public safety, Congress may need to

1   make "predictive judgments" about the risk of dangerous behavior.  Turner Broad. Sys. v. FCC,

2   512 U.S. 622, 665 (1994).  Such judgments are entitled to "substantial deference" by the courts

3   because Congress is "far better equipped than the judiciary" to collect, weigh, and evaluate the

4   relevant evidence and to formulate appropriate firearms policy in response.  Id. at 665–66.

5   Third, "the nature and quantity of any showing required by the government 'to satisfy heightened

6   judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility

7   of the justification raised.'"  Carter, 2012 WL 207067, at *6 (quoting Nixon v. Shrink Mo. Gov't

8   PAC, 528 U.S. 377, 391 (2000)).  Since it is hardly novel—and entirely plausible—that mixing

9   guns and drugs poses a severe risk to public safety, the government's burden here is relatively

10  low.  Finally, the government may carry its burden by relying on "a wide range of sources, such

11  as legislative text and history, empirical evidence, case law, and common sense, as

12  circumstances and context require."  Id.

13          All of these sources point inexorably to the conclusion that a substantial relationship

14  exists between § 922(g)(3) as applied to marijuana users and Congress's goals of protecting

15  public safety and combatting violent crime.  Congress enacted the precursor to what is now

16  § 922(g)(3) in the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.  Congressional

17  action was prompted by the "increasing rate of crime and lawlessness and the growing use of

18  firearms in violent crime."  H.R. Rep. No. 90-1577, at 7 (1968), reprinted in 1968 U.S.C.C.A.N.

19  4410, 4412.  To meet this growing problem, Congress banned certain classes of individuals from

20  receiving firearms shipped in interstate commerce based on Congress's determination that access

21  to guns by those groups of people was generally contrary to the public interest.  See Huddleston

22  v. United States, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control

23  legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally

24  entitled to possess them because of age, criminal background, or incompetency.'" (quoting S.

25  Rep. No. 90-1501, at 22 (1968))).  As the House manager stated during debate on the legislation:

26          [W]e are convinced that a strengthened [firearms control system] can significantly
        contribute to reducing the danger of crime in the United States.  No one can

27

28                                                  22

1
2

> dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms.  This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons.

3   114 Cong. Rec. 21657, 21784 (1968) (quoted in Huddleston, 415 U.S. at 828; Yancey, 621 F.3d

4   at 686).  Moreover, Congress evidenced a particular concern with marijuana use: "[w]hile the

5   statute swept in users of several different categories of drugs, marijuana was the only drug

6   specifically listed by name."  Carter, 2012 WL 207067, at *5 (citing 82 Stat. 1213, 1220–21,

7   which prohibited receipt of firearms by any person who is "'an unlawful user of or addicted to

8   marihuana or any depressant or stimulant drug . . . or narcotic drug'"). [12]

9        Significantly, Congress is not the only legislative body to draw the conclusion that guns

10  and drugs do not mix.  Rather, as the court in Yancey found significant, "many states have

11  restricted the right of habitual drug abusers or alcoholics to possess or carry firearms."  621 F.3d

12  at 684.[13]  Indeed, Nevada is among the states that have codified an analogue to § 922(g)(3); the

13  state legislature amended a pre-existing provision in 2003 to specify that "[a] person shall not

14  own or have in his or her possession or under his or her custody or control any firearm if the

15  person . . . [i]s an unlawful user of, or addicted to, any controlled substance."  Nev. Rev. Stat.

16  § 202.360(1)(c).  Like § 922(g)(3), the state statute further provides that "'controlled substance'

17  has the meaning ascribed to it in 21 U.S.C. § 802(6)."  Id. § 202.360(3)(a).  Taken together, the

18
19
20

---

[12] As Carter notes in recounting § 922(g)(3)'s legislative history, the "the 1968 enactment . . . contained a number of loopholes."  Id. at *6.  The provision took its current shape with the enactment of the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449, 452 (1986).

21
22
23
24
25
26

[13] See Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7), (8); Cal. Penal Code § 12021(a)(1); Colo. Rev. Stat. § 18-12-203(1)(e), (f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C. Code § 22-4503(a)(4); Fla. Stat. § 790.25(2)(b)(1); Ga. Code Ann. § 16-11-129(b)(2)(F), (I), (J); Haw. Rev. Stat. § 134-7(c)(1); Idaho Code Ann. § 18-3302(1)(e); 720 Ill. Comp. Stat. 5/24-3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-4204(a)(1); Ky. Rev. Stat. Ann. § 237.110(4)(d), (e); Md. Code Ann., Public Safety, 5-133(b)(4), (5); Mass. Gen. Laws ch. 140, § 129B(1)(iv); Minn. Stat. § 624.713(1)(10)(iii); Mo. Rev. Stat. § 571.070(1)(1); Nev. Rev. Stat. § 202.360(1)(c); N.H. Rev. Stat. Ann. § 159:3(b)(3); N.J. Stat. Ann. § 2C:58-3(c)(2); N.C. Gev. Stat. § 14-404(c)(3); Ohio Rev. Code Ann. § 2923.13(A)(4); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7-7.1(3); W. Va. Code § 61-7-7(a)(2), (3).

27
28

23

state legislation "demonstrate[s] that Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms." Yancey, 621 F.3d at 684.

This shared legislative judgment is amply supported by academic research and empirical studies demonstrating the heightened risk to the public safety posed by the possession of firearms by marijuana users. According to the Bureau of Justice Statistics, a 2004 survey found that "32% of state prisoners and 26% of federal prisoners said they had committed their current offense while under the influence of drugs." Bureau of Justice Statistics, Drugs and Crime Facts, http://bjs.ojp.usdoj.gov/content/dcf/duc.cfm [App. at Tab 5]. Marijuana, moreover, was the most frequent drug of choice: a 2002 survey of convicted jail inmates found that marijuana was the most common drug used at the time of the offense, and similar results were found among probationers. Id. Moreover, the Office of National Drug Control Policy's ("ONDCP's") arrestee drug abuse monitoring program, which collects data in 10 cities from males 18 years and older at the point of their involvement in the criminal justice system, found that "[m]arijuana was the most commonly detected drug in all of the . . . sites in 2010." ONDCP, ADAM II 2010 Annual Report, at 20 (2010), available at http://www.whitehouse.gov/sites/default/files/ondcp/policy-and-research/adam2010.pdf [App. at Tab 6]. In the ten years that ONDCP has been collecting data, "the proportion of arrestees testing positive for marijuana has never been less than 30 percent of the sample in any of the current 10 sites." Id. Indeed, "[i]n 2010, in 9 of the 10 sites, 40 percent or more of the arrestees reported [marijuana] use in the prior 30 days." Id. at 22.

This correlation between marijuana use and crime should be no surprise given the well-documented deleterious effects regular marijuana use has on an individual. Marijuana use is associated with impaired cognitive functioning, dependence, mental illness, and poor motor performance. See ONDCP, Fact Sheet: Marijuana Legalization, at 1 (Oct. 2010), available at http://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/marijuana_legalization_fact_sheet_3-3-11.pdf [App. at Tab 7]. Marijuana intoxication "can cause distorted perceptions, difficulty in thinking and problem solving," and "[s]tudies have shown an association between

chronic marijuana use and increased rates of anxiety, depression, suicidal thoughts, and schizophrenia."  Id. at 2; see also National Institute of Drug Abuse, Topics in Brief: Marijuana, at 1 (Dec. 2011), available at https://www.drugabuse.gov/sites/default/files/marijuana_3.pdf [App. at Tab 8] (noting that marijuana can have wide-ranging effects, including impaired short term memory, slowed reaction time and impaired motor coordination, altered judgment and decision-making, and altered mood); id. at 2 ("Population studies reveal an association between cannabis use and increased risk of schizophrenia and, to a lesser extent, depression and anxiety.").

The potential risks posed by the firearm possession of someone who uses this mind-altering substance are clear.  Moreover, nothing in these studies indicates that the effects of marijuana that make it dangerous for a user to possess a firearm are somehow mitigated when a doctor has indicated that "use of marijuana may mitigate the symptoms or effects of [a chronic or debilitating medical] condition."  Nev. Rev. Stat. § 453A.210(2)(a)(2).  The documented effects of marijuana use thus corroborate the substantial relationship between § 922(g)(3) and Congress's goal of protecting the public's safety.  See Yancey, 621 F.3d at 685 (recognizing that "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly firearms.").

In addition, the limited temporal reach of § 922(g)(3) helps ensure that it bears a reasonable fit to the ends that it serves.  Unlike most of § 922(g)'s other firearm exclusions, which may operate as lifetime bans, § 922(g)(3) only applies to those who are currently unlawful users.  See 27 C.F.R. § 478.11 (defining "unlawful user" so that any unlawful use must have "occurred recently enough to indicate that the individual is actively engaged in such conduct").  Through this feature, "Congress tailored the prohibition to cover only the time period during which it deemed such persons to be dangerous."  Carter, 2012 WL 207067, at *7.  Moreover, § 922(g)(3) "enables a drug user who places a high value on the right to bear arms to regain that right by parting ways with illicit drug use."  Id.  The choice is the user's, and nothing in the

25

1    Second Amendment "require[s] Congress to allow [the unlawful user] to simultaneously choose

2    both gun possession and drug abuse."  Yancey, 621 F.3d at 687.

3            Especially given the "substantial deference" afforded to "predictive judgments" made by

4    Congress in order to advance the nation's interests, Turner Broad. Sys., 512 U.S. at 665, these

5    sources demonstrate that § 922(g)(3), as applied to marijuana users, satisfies intermediate

6    scrutiny.  That Plaintiff has registered to use marijuana for purported medical purposes, as

7    opposed to recreational purposes, does nothing to change the result.  Plaintiff may attempt to

8    argue that § 922(g)(3) is unconstitutional as applied to her because she is a responsible marijuana

9    user who poses no genuine threat to public safety.  But such an argument is clearly precluded by

10   the Supreme Court's recognition in Heller that "some categorical disqualifications are

11   permissible" and that "Congress is not limited to case-by-case exclusions of persons who have

12   been shown to be untrustworthy with weapons."  Skoien, 614 F.3d at 641 (emphasis added); see

13   also Tooley, 717 F. Supp. 2d at 597 ("Section 922(g)(9) is of course overbroad in the sense that

14   not every domestic violence misdemeanant who loses his or her right to keep and bear arms

15   would have misused them against a domestic partner or other family member.  Under

16   intermediate scrutiny, however, the fit does not need to be perfect, but only be reasonably

17   tailored in proportion to the important interest it attempts to further.  As such, intermediate

18   scrutiny tolerates laws that are somewhat overinclusive." (citations omitted)); United States v.

19   Miller, 604 F. Supp. 2d 1162, 1172 (W.D. Tenn. 2009) ("[T]he nature of the threat posed by gun

20   violence makes narrowing the scope of gun regulation impracticable.").  Nor can Plaintiff

21   succeed on a Second Amendment challenge by "disagree[ing] with Congress' policy decision to

22   link the firearms prohibition in § 922(g)(3) to the Controlled Substances Act."  Carter, 2012 WL

23   207067, at *8.  As the Fourth Circuit recognized, "[i]n enacting § 922(g)(3), Congress could

24   have chosen to reexamine the foundations of national drug policy and to identify precisely what

25   kinds of drug users ought to be prohibited from possessing firearms.  Instead, it opted, quite

26   reasonably, to connect § 922(g)(3)'s prohibition on the carefully studied and regularly updated

27

28

                                                      26

1    list of substances contained in the Controlled Substances Act."  Id.  Given that § 922(g)(3)'s

2    means need only be reasonably tailored to its ends, this reasonable legislative judgment is

3    entirely consistent with the Second Amendment.

4        In sum, a variety of sources, including legislative text and history, empirical evidence,

5    case law, and common sense, demonstrate that § 922(g)(3), as applied to marijuana users, is

6    substantially related to the indisputably important government interest in protecting public safety

7    and preventing crime.  It therefore satisfies the requirements of intermediate-scrutiny review,

8    providing yet another reason why Plaintiff's constitutional challenge to § 922(g)(3), as

9    interpreted by ATF, must fail.

10        **B.    As Applied to Plaintiff, 18 U.S.C. § 922(d)(3), as Implemented and**
             **Interpreted by ATF, Does Not Violate the Second Amendment.**

11

12        Given that § 922(g)(3) is consistent with the Second Amendment, Plaintiff's challenge to

13    § 922(d)(3), as interpreted by ATF in the September 2011 Open Letter, is similarly unavailing.

14    First, it is important to note that § 922(d)(3)'s restriction is directed toward firearm sellers, not

15    the putative purchaser.  Nothing in Heller suggests that individuals have a right to sell firearms;

16    indeed, Heller's language, indicating that "nothing in our opinion should be taken to cast doubt

17    on . . . laws imposing conditions and qualifications on the commercial sale of arms," strongly

18    suggests otherwise.  554 U.S. at 626–27.  Along these lines, only one court to date appears to

19    have considered a Second Amendment challenge to § 922(d)(3), and it found that there was no

20    authority indicating that, "at the time of its ratification, the Second Amendment was understood

21    to protect an individual's right to sell a firearm."  United States v. Chafin, 423 F. App'x 342, 344

22    (4th Cir. Apr. 13, 2011) (unpublished).  Additionally, the right of "law-abiding, responsible

23    citizens to use arms in defense of hearth and home" that is at the "core" of the Second

24    Amendment, Heller, at 634–35, "does not necessarily give rise to a corresponding right to sell a

25    firearm," Chafin, 423 F. App'x at 344; cf. United States v. 12 200-Foot Reels of Super 8 mm.

26    Film, 413 U.S. 123, 128 (1973) ("We have already indicated that the protected right to possess

27

28

                                              27

1  obscene material in the privacy of one's home does not give rise to a correlative right to have

2  someone sell or give it to others.").

3  　　　This is not to say that restrictions on the sale of firearms can never implicate Second

4  Amendment concerns.  Yet, even assuming that to be the case, § 922(d)(3) still cannot run afoul

5  of the Second Amendment because, for all the reasons discussed above, the unlawful drug users

6  who are precluded from acquiring firearms by the statute's operation may constitutionally be

7  prohibited from possessing firearms.  In other words, given that it is consistent with the Second

8  Amendment for § 922(g)(3) to prohibit unlawful drug users from <u>possessing</u> firearm, § 922(d)(3)

9  cannot violate the Second Amendment simply because it blocks that same group from <u>acquiring</u>

10  firearms.

11  　　　To be sure, in addition to banning the sale of firearms to individuals who are known

12  unlawful drug users, § 922(d)(3) also prohibits the sale of firearms to individuals who the seller

13  has reasonable cause to believe are unlawful drug users, including individuals like Plaintiff who

14  have affirmatively registered to use marijuana.  Nothing in this restriction, however, violates the

15  Second Amendment.  Those who hold state-issued medical marijuana cards are either unlawful

16  drug users or are holding cards that serve them no purpose.  Plaintiff has a choice: she can either

17  retain her Nevada-issued medical marijuana card and forfeit the right to acquire a firearm, or she

18  can refrain from using marijuana, return her card to the State, and regain the right to acquire a

19  firearm.  Given that Plaintiff has chosen to keep her card, it is reasonable to infer that she has

20  done so in order to use marijuana.  Having made that decision, the "Second Amendment . . . does

21  not require Congress to allow [her] to simultaneously choose . . . gun possession."  <u>Yancey</u>, 621

22  F.3d at 687.[14]  As a result, Plaintiff has failed to state a Second Amendment claim against either

23  § 922(d)(3) or ATF's interpretation of that provision.

24
25
26
27

────────────────────────────

[14] Indeed, because Plaintiff's inability to acquire a firearm stems from her own decision to retain her medical marijuana registry card, any injury she suffers is traceable not to Defendants, but to her own decisionmaking, and is therefore insufficient to confer standing to prosecute her claims. <u>See</u> <u>Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales</u>, 468 F.3d 826, 831 (D.C. Cir. 2006) ("[S]elf-inflicted harm doesn't satisfy the basic requirements for standing."); <u>Fire</u>

(*Footnote continued on following page.*)

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     PLAINTIFF'S RIGHT TO EQUAL PROTECTION HAS NOT BEEN VIOLATED.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall. . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Although this clause expressly applies only to the States, the Supreme Court has found that its protections are encompassed by the Due Process Clause of the Fifth Amendment and therefore apply to the federal government.  <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954).  Count II of the Complaint challenges §§ 922(g)(3) and 922(d)(3), as implemented and interpreted by ATF, under the equal protection component of the Due Process Clause, Compl. ¶¶52–57, but this claim is also without merit.

The equal protection component of the Due Process Clause "is essentially a direction that all persons similarly situated should be treated alike."  <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432, 439 (1985).  As a result, "[t]o establish an equal protection violation, [the plaintiff] must show that she is being treated differently from similarly situated individuals."  <u>Gonzalez-Medina v. Holder</u>, 641 F.3d 333, 336 (9th Cir. 2011).  Plaintiff's equal protection claim appears to be premised on the theory that the United States is treating holders of medical marijuana registry cards differently from other law-abiding citizens.  <u>See</u> Compl. ¶ 3 (alleging that "Defendants have prohibited a certain class of law-abiding, responsible citizens from exercising their right to keep and bear arms"); <u>id.</u> ¶ 4 ("Based on the Defendants' interpretation of Section 922(g)(3) of the federal criminal code, the law prohibits law-abiding adults who have obtained medical marijuana cards pursuant to state law from lawfully purchasing" firearms).  Yet, Plaintiff's characterization to the contrary, the class of individuals holding state-issued medical marijuana registry cards is not similarly situated to law-abiding citizens.  It is entirely reasonable for the government to infer that those individuals who have affirmatively registered to

Equip. Mfrs. Ass'n v. Marshall, 679 F.2d 679, 682 n.5 (7th Cir. 1982) ("[P]etitioners cannot allege an injury from one of the options where they can choose another which causes them no injury").

29

use marijuana on the basis of chronic medical conditions are, in fact, marijuana users.  And because all users of marijuana are violating federal law, they are not similarly situated to those citizens who are not violating federal law.  See Marin Alliance for Med. Marijuana v. Holder, __ F.2d __, 2011 WL 5914031, at *13 (N.D. Cal. Nov. 28, 2011) (finding that those whose drug use violates the Controlled Substances Act are not similarly situated to those whose use is permitted by that law).  As a result, Plaintiff's Complaint does not allege that she has been "treated differently from similarly situated individuals," Gonzalez-Medina, 641 F.3d at 336, and it therefore fails to state an equal protection claim.

### III.   PLAINTIFF MAY NOT PURSUE CLAIMS FOR MONETARY RELIEF AGAINST THE UNITED STATES, ATF, OR THE INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES.

To the extent that Plaintiff asserts claims against the United States for monetary relief, such claims must be dismissed, as the waiver of sovereign immunity claimed by Plaintiff does not apply to actions for money damages.  In seeking monetary relief, Plaintiff does not appear to distinguish between the claims against the individual Defendants in their personal capacities and the claims against the United States, ATF, and the individual Defendants in their official capacities.  See Compl. ¶¶ 50, 56 (alleging that Plaintiff has suffered damages "[a]s a direct and proximate result of the foregoing law, policy, practice and/or procedure, as enacted and promulgated by the Defendants"); ¶ 59 ("The Defendants, and each of them, acted in concert to deprive the Plaintiff of her Second and Fifth Amendment rights . . . ." (emphasis added)); ¶ 60 ("As a direct and proximate result of the Defendants' above-described actions, the Plaintiff has suffered and continues to suffer damages . . . .").  Nor does she identify the specific parties from whom she seeks "compensatory and punitive damages" in her prayer for relief.  Id. at 10, ¶ 4.

The United States, as a sovereign, is immune from suit unless it has waived its immunity. Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999); Levin v. United States, 663 F.3d 1059, 1061 (9th Cir. 2011).  The immunity applies regardless of whether a plaintiff sues the United States, one of its agencies, or one of its officers acting in an official capacity.  See Balser

v. Dep't of Justice, Office of U.S. Tr., 327 F.3d 903, 907 (9th Cir. 2003) ("In sovereign immunity analysis, any lawsuit against an agency of the United States or against an officer of the United States in his or her official capacity is considered an action against the United States."). In particular, the United States has not waived its sovereign immunity for damages claims based on constitutional violations.  See Dyer v. United States, 166 F. App'x 908, 909 (9th Cir. 2006) ("To the extent [plaintiff] sought damages from the United States for allegedly violating his constitutional rights, his claim was barred by sovereign immunity."); Hamrick v. Brusseau, 80 F. App'x 116, 116 (D.C. Cir. 2003) ("[T]he United States has not waived sovereign immunity with respect to actions for damages based on violations of constitutional rights by federal officials, whether brought against the United States directly . . . or against officers sued in their official capacities . . . .") (internal citations omitted).  "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text." Lane v. Peña, 518 U.S. 187, 192 (1996).

Plaintiff seeks to avail herself of the waiver of sovereign immunity contained in Section 702 of the Administrative Procedure Act.  Compl. ¶ 11 (alleging that the United States "is a proper defendant in this action pursuant to 5 U.S.C. § 702").  But this waiver only applies to constitutional claims for non-monetary relief.  See 5 U.S.C. § 702 ("An action in a court of the United States seeking relief other than monetary damages . . ." (emphasis added)); Tucson Airport Auth. v. Gen. Dynamics Corp., 136 F.3d 641, 645 (9th Cir. 1998) ("By its own terms, § 702 does not apply to claims for 'money damages . . . .'").  Accordingly, all claims seeking monetary relief from the United States, ATF, or the individual defendants in their official capacity must be dismissed.

## IV.   PLAINTIFF'S CONSPIRACY CLAIM AGAINST THE UNITED STATES MUST BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

In addition, to the extent that Plaintiff intends to pursue a common-law conspiracy claim against the United States, this Court should dismiss the claim for Plaintiff's failure to exhaust her

administrative remedies, as well as under the "due care" exception to the Federal Torts Claim

Act's waiver of sovereign immunity.  Plaintiff asserts a claim for "conspiracy" under Nevada tort

law.  See Comp. ¶¶ 58-61.  Though Plaintiff's claim is against "all Defendants," only the United

States will remain as a party to the conspiracy claim following substitution under the Federal

Employees Liability Reform and Tort Compensation Act (the "Westfall Act").  As set forth in

the accompanying memorandum by the individual defendants, see Memo of Individual

Defendants at 13-14, under the Westfall Act, once the Attorney General or his designee certifies

that an employee was acting within the scope of employment when the claim arose, the action

against the employee in his or her individual capacity "shall be deemed an action against the

United States . . . , and the United States shall be substituted as the party defendant."  28 U.S.C.

§ 2679(d)(1).  The Attorney General's designee in this case has made this certification.  See Att.

A to Memo of Individual Defendants.  Therefore, the only remaining party to Plaintiff's tort

claim is the United States.

    This Court should dismiss the conspiracy claim for lack of subject matter jurisdiction

once the United States is substituted as a party. [15]  Under the Federal Torts Claim Act, a plaintiff

cannot proceed in tort against the United States without first seeking administrative resolution of

the claim.  28 U.S.C. § 2675(a).  The exhaustion requirement of § 2675(a) is a jurisdictional

limitation.  See Wilson v. Drake, 87 F.3d 1073, 1076 (9th Cir. 1996).  Here, Plaintiff does not

allege that she exhausted her administrative remedies.  Therefore, Plaintiff's conspiracy claim

against the United States must be dismissed for lack of subject matter jurisdiction.  Id. (finding

jurisdiction lacking where plaintiff failed to exhaust administrative remedies in tort claim against

the United States as Westfall Act substitute).  In addition, to the extent that Plaintiff's conspiracy

claim challenges the enforcement of 18 U.S.C. §§ 922(d)(3) and (g)(3) and the accompanying

provisions of the Code of Federal Regulations, Plaintiff's claim is expressly excluded from

---

[15] The fact that a claim against the United States must immediately fail following substitution
under the Westfall Act does not preclude substitution.  See United States v. Smith, 499 U.S. 160,
165-66 (1991); Levin v. United States, 663 F.3d 1059, 1064 (9th Cir. 2011).

1  coverage under the "due care" exception to the FTCA's waiver of sovereign immunity.  See 28

2  U.S.C. 2680(a) (preserving immunity for "[a]ny claim based upon an act or omission of an

3  employee of the Government, exercising due care, in the execution of a statute or regulation,

4  whether or not such statute or regulation be valid").[16]

5                              **CONCLUSION**

6          For the reasons stated herein, Plaintiff's Complaint should be dismissed in its entirety or,

7  in the alternative, summary judgment should be entered in the favor the United States on all of

8  Plaintiff's claims.

9  Dated: February 3, 2012                    Respectfully submitted,

10                                            TONY WEST
                                             Assistant Attorney General
11
                                             DANIEL G. BOGDEN
12                                           United States Attorney

13                                           SANDRA SCHRAIBMAN
                                             Assistant Director
14
                                             _/s/ Alicia N. Ellington_
15                                           ALICIA N. ELLINGTON
                                             JOHN K. THEIS
16                                           Trial Attorneys
                                             United States Department of Justice
17                                           Civil Division, Federal Programs Branch
                                             20 Massachusetts Ave., N.W., Rm. 7226
18

19  [16] Beyond the jurisdictional bar, Plaintiff's claim must fail under Nevada tort law.  In Nevada, a
    conspiracy requires "the commission of an underlying tort."  Boorman v. Nev. Mem'l Cremation
20  Soc'y, Inc., 772 F. Supp. 2d 1309, 1315 (D. Nev. 2011) (citing Jordan v. State ex rel. Dep't of
    Motor Vehicles & Pub. Safety, 110 P.3d 30, 51 (Nev. 2005) (per curiam), abrogated on other
21  grounds by Buzz Stew, LLC v. City of N. Las Vegas, 181 P.3d 670, 672 n.6 (Nev. 2008)).  As
    demonstrated herein, see supra at Argument Parts I-II, and in the individual defendants'
22  memorandum, neither the United States nor any of its employees have committed any actionable
    constitutional tort.  In addition, under Nevada law, a plaintiff must prove "an explicit or tacit
23  agreement between the tortfeasors."  Azpilcueta v. State of Nev. ex rel. Transp. Auth., 2010 WL
    2871073, at *3 (D. Nev. 2010) (citing GES, Inc. v. Corbitt, 21 P.3d 11, 15 (Nev. 2001)).  Here,
24  Plaintiff has not alleged any facts to support her conclusory assertion that the Defendants "acted
    in concert to deprive Plaintiff of her [constitutional] rights."  Compl. ¶ 59. The claim fails to rise
25  above mere speculation and accordingly must be dismissed.  See Bell Atlantic Corp. v.
    Twombly, 550 U.S. 544, 555 (2007).
26

27

28

Washington, D.C.  20530
Telephone: (202) 305-8550
Facsimile: (202) 616-8460
Alicia.N.Ellington@usdoj.gov
John.K.Theis@usdoj.gov


*Attorneys for Defendants the United States of
America, ATF, U.S. Attorney General Eric Holder,
Acting ATF Director B. Todd Jones, and
Assistant ATF Director Arthur Herbert,
in their official capacities (collectively, the United
States)*

1

## **PROOF OF SERVICE**

2        I, Alicia N. Ellington, Trial Attorney with the United States Department of Justice, certify

3    that the following individuals were served with **THE UNITED STATES' MOTION TO**
     **DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** on this date by

4    the below identified method of service:

5        **Electronic Case Filing**:

6

7        Charles C. Rainey
         Rainey Devine, Attorneys at Law

8        2245 W. Horizon Ridge Pkwy., Ste. 110
         Henderson, NV 89052

9        chaz@raineydevine.com

10       *Attorney for Plaintiff*

11

12       Zachary Richter
         Trial Attorney, Constitutional Torts Staff

13       United States Department of Justice, Civil Division
         P.O. Box 7146, Ben Franklin Station

14       Washington, D.C. 20044
         Zachary.Richter@usdoj.gov

15

16       *Attorney for Defendants Eric Holder, B. Todd Jones,*

17       *and Arthur Herbert in their individual capacities*

18

19       DATED this 3rd day of February 2012.

20
                                            */s/ Alicia N. Ellington*
21                                          ALICIA N. ELLINGTON
                                            Trial Attorney
22                                          United States Department of Justice

23

24

25

26

27

28