STUART F. DELERY
Principal Deputy Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

DIANE KELLEHER
Assistant Director, Federal Programs Branch

JOHN K. THEIS
Trial Attorney, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm. 6701
Washington, D.C. 20530
Telephone: (202) 305-7632
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| S. ROWAN WILSON,<br><br>              Plaintiff,<br><br>       v.<br><br>ERIC HOLDER, Attorney General of the<br>United States, *et al.*,<br><br>              Defendants. | Case No.: 2:11-cv-1679-GMN-(PAL)<br><br>**HEARING REQUESTED** |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED**
**COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

     Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 56, Defendants, the

United States of America, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and the

individual defendants in their official capacities, by their undersigned counsel, hereby move this

Court to dismiss Plaintiff's First Amended Complaint or, in the alternative, to enter summary

judgment for Defendants. A Memorandum of Points and Authorities accompanies this motion,

along with an Appendix of Secondary Material and a Statement of Undisputed Material Facts.

Dated: January 31, 2013

Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

DIANE KELLEHER
Assistant Director

*/s/ John K. Theis*
JOHN K. THEIS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

*Attorneys for Defendants*

# **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

STATUTORY AND REGULATORY BACKGROUND ........................................3

   I.    THE GUN CONTROL ACT AND THE CONTROLLED
        SUBSTANCES ACT  ...............................................................3

   II.   NEVADA'S LAW REGARDING THE USE OF MARIJUANA ...........................5

   III.  ATF'S SEPTEMBER 2011 OPEN LETTER TO FFLS ..........................................8

PROCEDURAL HISTORY ....................................................................................9

ARGUMENT ...........................................................................................................11

   I.    PLAINTIFF LACKS STANDING TO CHALLENGE THE STATUTES, THE
        REGULATION, AND ATF'S OPEN LETTER ....................................................11

       A.  Plaintiff Cannot Establish the "Injury in Fact" Requirement Because She
            Lacks a Valid Medical Marijuana Card.............................................................12

       B.  Plaintiff Cannot Satisfy the Traceability Elements of Standing Because Her
            Injury is Self-Inflicted.......................................................................................13

       C.  Plaintiff Cannot Satisfy the Traceability or Redressability Elements of
            Standing Because She Has Not Challenged Nevada's Prohibition on the
            Possession of a Firearm by an "Unlawful User" ..............................................13

   II.   PLAINTIFF'S SECOND AMENDMENT RIGHTS HAVE NOT BEEN
        VIOLATED..........................................................................................................15

       A.  18 U.S.C. § 922(g)(3), as Implemented and Interpreted by ATF, Does Not
            Violate the Second Amendment.. ......................................................................16

            1.  Plaintiff's Second Amendment Challenge to § 922(g)(3) is Foreclosed
                by the Ninth Circuit's Decision in *Dugan*.. .........................................16

            2.  Even if *Dugan* Did Not Foreclose Plaintiff's Challenge, Her Claim
                Would Still Fail, Because Unlawful Drug Users, Including Those Who
                Comply with State Medical Marijuana Laws, Fall Outside the Scope of
                the Second Amendment.. ........................................................................19

            3.  In Any Event, 18 U.S.C. § 922(g)(3) Substantially Relates to the
                Important Governmental Interest in Protecting Public Safety and
                Combating Violent Crime.. .....................................................................23

       B.  18 U.S.C. § 922(d)(3), as Implemented and Interpreted by ATF, Does Not
            Violate the Second Amendment. ......................................................................31

       C.  27 C.F.R. § 478.11 Does Not Violate the Second Amendment. .....................31

       D.  The Open Letter Does Not Violate the Second Amendment. .........................32

i

III.   PLAINTIFF'S FIRST AMENDMENT RIGHTS HAVE NOT BEEN
VIOLATED..................................................................................35

IV.   PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM SHOULD BE
DISMISSED AS DUPLICATIVE OF HER CLAIMS UNDER THE FIRST AND
SECOND AMENDMENTS ...............................................................38

V.   PLAINTIFF'S PROCEDURAL DUE PROCESS MUST BE DISMISSED
BECAUSE SHE HAS NOT BEEN DEPRIVED OF A CONSTITUTIONALLY-
PROTECTED LIBERTY INTEREST ...................................................39

VI.   PLAINTIFF'S EQUAL PROTECTION MUST BE DISMISSED BECAUSE SHE
HAS NOT IDENTIFIED SIMILARLY SITUATED INDIVIDUALS THAT
DEFENDANTS HAVE TREATED DIFFERENTLY ...........................................40

VII.   AS PLAINTIFF PREVIOUSLY CONCEDED, SHE CANNOT SEEK
MONETARY DAMAGES AGAINST THE UNITED STATES ...........................42

CONCLUSION....................................................................................43

# TABLE OF AUTHORITIES

**<u>CASES</u>**                                                                               **<u>PAGE(S)</u>**

*Albright v. Oliver,*
    510 U.S. 266 (1994)....................................................................38

*Allen v. Wright,*
    468 U.S. 737 (1984)....................................................................14

*Auer v. Robbins,*
    519 U.S. 452 (1997)....................................................................35

*Bolling v. Sharpe,*
    347 U.S. 497 (1954)....................................................................40

*Christensen v. Harris County,*
    529 U.S. 576 (2000)....................................................................35

*City of Cleburne v. Cleburne Living Ctr., Inc.,*
    473 U.S. 432 (1985)....................................................................40

*Clark K. v. Willden,*
    616 F. Supp. 2d 1038 (D. Nev. 2007) ........................................39

*Dearth v. Holder,*
    641 F.3d 499 (D.C. Cir. 2011)...............................................11, 42

*Denney v. DEA,*
    508 F. Supp. 2d 815 (E.D. Cal. 2007) ........................................38

*Dep't of Army v. Blue Fox, Inc.,*
    525 U.S. 255 (1999)....................................................................42

*Dickerson v. New Banner Institute,*
    460 U.S. 103 (1983)......................................................................4

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)........................................................... *passim*

*Dyer v. United States,*
    166 F. App'x 908 (9th Cir. 2006)...............................................42

*Erickson v. United States,*
    67 F.3d 858 (9th Cir. 1995).........................................................39

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011).......................................................19

*Ferguson v. Skrupa,*
    372 U.S. 726 (1963)....................................................................32

*Fire Equip. Manufacturers Association v. Marshall,*
    679 F.2d 679 (7th Cir. 1982).......................................................13

*Fontana v. Haskin*,
    262 F.3d 871 (9th Cir. 2001) ...................................................................38

*Freeman v. City of Santa Ana*,
    68 F.3d 1180 (9th Cir. 1995) ...................................................................41

*Friends of the Earth, Inc. v. Laidlaw Environmental Services Inc.*,
    528 U.S. 167 (2000) ...................................................................11

*Gallegos v. State*,
    123 Nev. 289 (Nev. 2007) ...................................................................14

*Gonzales v. Raich*,
    545 U.S. 1 (2005) ................................................................... *passim*

*Gonzalez-Medina v. Holder*,
    641 F.3d 333 (9th Cir. 2011) ...................................................................40, 42

*Graham v. Connor*,
    490 U.S. 386 (1989) ...................................................................38

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ................................................................... *passim*

*Johnston v. Port Authority of New York and New Jersey*,
    2011 WL. 3235760 (E.D.N.Y. July 28, 2011) ...................................................................36

*Kachalsky v. Cnty. of Westchester*,
    701 F.3d 81 ...................................................................26, 34

*Kendall v. Emps. Retirement Plan of Avon Products*,
    561 F.3d 112 (2d Cir. 2009) ...................................................................13

*Kildare v. Saenz*,
    325 F.3d 1078 (9th Cir. 2003) ...................................................................39

*Lacey v. Maricopa Co.*,
    693 F.3d 896 (9th Cir. 2012) ...................................................................35

*Lane v. Holder*,
    2012 WL. 6734784 (4th Cir. Dec. 31, 2012) ...................................................................12

*Lane v. Pena*,
    518 U.S. 187 (1996) ...................................................................42

*Levin v. United States*,
    663 F.3d 1059 (9th Cir. 2011) ...................................................................42

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ...................................................................12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................12, 14

*Marin Alliance for Medical Marijuana v. Holder,*
    866 F. Supp. 2d 1142 (2011) ............................................................. 39, 41, 42

*McDonald v. City of Chicago,*
    130 S. Ct. 3020 (2010) ........................................................................ 17, 21

*Midwest Media Prop. L.L.C. v. Symmes Twp.,*
    503 F.3d 456 (6th Cir. 2007) ...................................................................... 15

*Mora-Meraz v. Thomas.,*
    601 F.3d 933 (9th Cir. 2010) ...................................................................... 15

*Nat'l Family Planning & Reproductive Health Association v. Gonzales,*
    468 F.3d 826 (D.C. Cir. 2006) .................................................................... 13

*Nordyke v. King,*
    319 F.3d 1185 (9th Cir. 2003) .................................................................... 36

*Nordyke v. King,*
    644 F.3d 776 (9th Cir. 2011) ...................................................................... 22

*Nordyke v. King,*
    681 F.3d 1041 (9th Cir. 2012) (*en banc*) .................................................. 9, 24

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ................................................................................... 13

*Peruta v. Cnty. of San Diego,*
    758 F. Supp. 2d 1106 (S.D. Cal. 2010) ..................................................... 26

*Pohlabel v. State,*
    268 P.3d 1264 (Nev. 2012) ........................................................................ 14

*Price v. Stevedoring Services of America, Inc.,*
    697 F.3d 820 (9th Cir. 2012) ...................................................................... 35

*Pritikin v. Department of Energy,*
    254 F.3d 791 (9th Cir. 2001) .................................................................. 14-15

*Raich v. Gonzales,*
    500 F.3d 850 (9th Cir. 2007) ............................................................. 18, 38, 39

*Richards v. Cnty. of Yolo,*
    821 F. Supp. 2d 1169 (E.D. Cal. 2011) ............................................... 38, 39

*Robertson v. Baldwin,*
    165 U.S. 275 (1897) ................................................................................... 20

*Romer v. Evans,*
    517 U.S. 620 (1996) ................................................................................... 42

*Rutan v. Republican Party of Ill.,*
    497 U.S. 62 (1990) ..................................................................................... 20

*San Diego Cnty. Gun Rights Committee v. Reno,*
    98 F.3d 1121 (9th Cir. 1996) ..................................................12, 14, 15

*Schall v. Martin,*
    467 U.S. 253 (1984) ................................................................................25

*Shaw v. Terhune*
    380 F.3d 473 (9th Cir. 2004) ..................................................................11

*Skidmore v. Swift & Co.,*
    323 U.S. 134 (1944) ................................................................................35

*Spence v. Washington,*
    418 U.S. 405 (1974) ..........................................................................36, 37

*State v. Shelby,*
    2 S.W. 468 (Mo. 1886) ............................................................................22

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) ..................................................................................12

*Stormans, Inc. v. Selecky,*
    586 F.3d 1109 (9th Cir. 2009) ................................................................25

*Texas v. Johnson,*
    491 U.S. 397 (1989) ..........................................................................36, 37

*Town of Castle Rock, Colo. v. Gonzales,*
    545 U.S. 748 (2005) ................................................................................19

*Turner Broad. System v. FCC,*
    512 U.S. 622 (1994) ....................................................................... *passim*

*United States v. Carter,*
    669 F.3d 411 (4th Cir. 2012) ......................................................... *passim*

*United States v. Carter,*
    2012 WL 5935710 (S.D. W. Va. Nov. 27, 2012)....................................17

*United States v. Chafin,*
    423 F. App'x 342, 344 ............................................................................31

*United States v. Dugan,*
    657 F.3d 998 (9th Cir. 2011) ......................................................... *passim*

*United States v. Hendrickson,*
    664 F. Supp. 2d 793 (E.D. Mich. 2009)..................................................41

*United States v. Hendrix,*
    2010 WL. 1372663 (W.D. Wis. Apr. 6, 2010) .......................................23

*United States v. Jae Gab Kim,*
    449 F.3d 933 (9th Cir. 2006) ..................................................................33

*United States v. Johal,*
    428 F.3d 823 (9th Cir. 2005) ............................................................. 33

*United States v. Lanier,*
    520 U.S. 259 (1997) ............................................................................. 38

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010) ........................................................... 19, 25

*United States v. Miller,*
    604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ......................................... 34

*United States v. O'Brien,*
    391 U.S. 367 (1968) ............................................................................. 37

*United States v. Oakland Cannabis Buyers' Cooperative,*
    532 U.S. 483 (2001) ......................................................................... 5, 39

*United States v. Patterson,*
    431 F.3d 832 (5th Cir. 2005) ............................................................. 17

*United States v. Reese,*
    627 F.3d 792 (10th Cir. 2010) ..................................................... 19, 25

*United States v. Rene E.,*
    583 F.3d 8 (1st Cir. 2009) .................................................................. 23

*United States v. Richard,*
    350 F. App'x 252, 260 (10th Cir. 2009) ........................................... 17

*United States v. Salerno,*
    481 U.S. 739 (1987) ....................................................................... 25, 32

*United States v. Seay,*
    620 F.3d 919 (8th Cir. 2010) ............................................................. 17

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010) ..................................................... *passim*

*United States v. Stacy,*
    2010 WL 4117276 (S.D. Cal. Oct. 18, 2010) ................................... 19

*United States v. Tooley,*
    717 F. Supp. 2d 580 (S.D. W. Va. 2010) ................................... *passim*

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) ........................................................... 23

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) ..................................................... *passim*

*Vacco v. Quill,*
    521 U.S. 793 (1997) ............................................................................. 40

*White v. United States*,
    2009 WL 173509 (S.D. Ohio Jan. 26, 2009) ..................................................15

**UNITED STATES CONSTITUTION**

U.S. Const. amend. II ..................................................................................16

U.S. Const. amend. XIV, § 1 ........................................................................41

**FEDERAL STATUTES**

5 U.S.C. § 702 .............................................................................................5

18 U.S.C. § 922(d)(3) ........................................................................... *passim*

18 U.S.C. § 922(g) ................................................................................24, 25

18 U.S.C. § 922(g)(1) ................................................................................17

18 U.S.C. § 922(g)(3) ........................................................................... *passim*

18 U.S.C. § 922(g)(4) ................................................................................17

18 U.S.C. § 922(g)(8) ................................................................................25

18 U.S.C. § 922(k) ....................................................................................25

21 U.S.C. § 802 ......................................................................................4, 14

21 U.S.C. § 812 .............................................................................................4

21 U.S.C. § 812(b) ..................................................................................5, 18

21 U.S.C. § 812(c) .........................................................................................5

21 U.S.C. § 823(f) .........................................................................................5

21 U.S.C. § 829 ......................................................................................5, 18

21 U.S.C. § 844(a) ..................................................................................5, 18

28 U.S.C. § 2201 ........................................................................................12

Firearm Owners' Protection Act,
    Pub. L. No. 99-308, 100 Stat. 449, 452 (1986).....................................27

Gun Control Act of 1968,
    Pub. L. No. 90-618, 82 Stat. 1213 ..................................................3, 26

**RULES AND REGULATIONS**

27 C.F.R. § 478.11 ............................................................................... *passim*

27 C.F.R. § 478.124 ......................................................................................9

Notice of Denial of Petition, 76 Fed. Reg. 40552 (July 8, 2011) ...................................................5

**STATE STATUTES**

720 Ill. Comp. Stat. 5/24-3.1(a)(3) ........................................................................................27

Ind. Code § 35-47-1-7(5) .........................................................................................................27

Ala. Code § 13A-11-72(b) ........................................................................................................27

Ark. Code Ann. § 5-73-309(7), (8) ..........................................................................................27

Cal. Penal Code § 12021(a)(1) .................................................................................................27

Colo. Rev. Stat. § 18-12-203(1) ...............................................................................................27

Del. Code Ann. tit. 11, § 1448(a)(3) ........................................................................................27

D.C. Code § 22-4503(a)(4) .......................................................................................................27

Fla. Stat. § 790.25(2) ................................................................................................................27

Ga. Code Ann. § 16-11-129(b)(2)(F) .......................................................................................27

Haw. Rev. Stat. § 134-7(c)(1) ..................................................................................................27

Idaho Code Ann. § 18-3302(1) .................................................................................................27

Ind. Code § 35-47-1-7(5) .........................................................................................................27

Kan. Stat. Ann. § 21-4204(a)(1) ...............................................................................................27

Ky. Rev. Stat. Ann. § 237.110(4) .............................................................................................27

Md. Code Ann., Public Safety, 5-133(b)(4), (5) ......................................................................27

Mass. Gen. Laws ch. 140, § 129B(1)........................................................................................27

Minn. Stat. § 624.713(1)(10)(iii) ..............................................................................................27

Mo. Rev. Stat. § 571.070(1)(1) ................................................................................................27

Nev. Rev. Stat. § 202.360(1) ....................................................................................................27

N.H. Rev. Stat. Ann. § 159:3(b)(3) ..........................................................................................27

N.J. Stat. Ann. § 2C:58-3(c)(2) ................................................................................................27

N.C. Gev. Stat. § 14-404(c)(3) .................................................................................................27

Ohio Rev. Code Ann. § 2923.13(A)(4) .....................................................................................27

R.I. Gen. Laws § 11-47-6 ..........................................................................................................27

Nev. Rev. Stat. § 202.360(1) .......................................................................................... *passim*

Nev. Rev. Stat. § 453.336 ...................................................................................5, 27

Nev. Rev. Stat. § 453A .......................................................................................6, 27

Nev. Rev. Stat. § 453A.050 ...........................................................................6, 27, 33

Nev. Rev. Stat. § 453A.200 ...............................................................................6, 27

Nev. Rev. Stat. § 453A.210 .........................................................................27, 29, 33

Nev. Rev. Stat. § 453A.220 .............................................................................27, 33

Nev. Rev. Stat. § 453A.240 .............................................................................27, 33

Nev. Rev. Stat. § 453A.300 ....................................................................................6

S.C. Code Ann. § 16-23-30(A)(1) ...........................................................................27

S.D. Codified Laws § 23-7-7.1(3) ...........................................................................27

W. Va. Code § 61-7-7(a)(2), (3) ..............................................................................27

## LEGISLATIVE MATERIAL

114 Cong. Rec. 21657, 21784 (1968) ......................................................................27

H.R. Rep. No. 90-1577, at 7 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4412. .....................26

S. Rep. No. 90-1501, at 22 (1968) ..........................................................................27

## MISCELLANEOUS

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 Hastings L.J. 1339 (2009) ...................................................22

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self- Defense: An Analytical Framework and Research Agenda,* 56 UCLA L. Rev. 1443 (2009).................22

Joyce Lee Malcolm, *To Keep and Bear Arms* 123 (1994) ............................................21

Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law & Contemp. Probs. 143 (1986) ...........23

National Institute of Drug Abuse, *Topics in Brief: Marijuana* (Dec. 2011) ...............................28

Nev. State Health Div., *Medical Marijuana, Frequently Asked Questions*, No. 8.........................7

Nev. State Health Div., *Program Facts* 2 (Feb. 12, 2009) .............................................7

ONDCP, *ADAM II 2010 Annual Report*, at 20 (2010).................................................28

ONDCP, *Fact Sheet: Marijuana Legalization*, at 1 (Oct. 2010).......................................28

Robert E. Shalhope, *The Armed Citizen in the Early Republic,* 49 Law & Contemp. Probs. 125, 130 (1986).................................................................21

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487 (2004)..................................................22

Patrick Charles, "*Arms for Their Defence?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Clev. State L. Rev. 351 (2009) .........21

## **FEDERAL RULES OF CIVIL PROCEDURE**

Fed. Rule of Civ. Pro. 12(b)(1) ............................................................10

Fed. Rule of Civ. Pro. 12(b)(6) ............................................................10

Fed. Rule of Civ. Pro.56...................................................................10

STUART F. DELERY
Principal Deputy Assistant Attorney General

DANIEL G  BOGDEN
United States Attorney

DIANE KELLEHER
Assistant Director, Federal Programs Branch

JOHN K. THEIS
Trial Attorney, Federal Programs Branch
United States Department of Justice, Civil Division
20 Massachusetts Ave., N.W., Rm.  6701
Washington, D.C.  20530
Telephone: (202) 305-7632
Facsimile: (202) 616-8460
John.K.Theis@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

S. ROWAN WILSON,

                Plaintiff,

       v.

ERIC HOLDER, Attorney General of the
United States, *et al.*,

              Defendants.

Case No.: 2:11-cv-1679-GMN-(PAL)

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

As explained in Defendants' first motion to dismiss, 18 U.S.C. § 922(g)(3) prohibits an unlawful user of a controlled substance from possessing a firearm, while § 922(d)(3) prohibits the sale of firearms by a person who knows or has reasonable cause to believe that the purchaser is an unlawful user of a controlled substance.  The Controlled Substances Act classifies marijuana as a Schedule I controlled substance that cannot be lawfully prescribed and that the general public may not lawfully possess.  Although a number of states, including Nevada, have exempted from state criminal prosecution certain individuals who use marijuana for medical

1

purposes,[1] these state laws do not alter the fact that marijuana possession remains prohibited under federal law.  To advise federal firearms licensees ("FFLs") of this basic fact, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") issued an Open Letter to all FFLs on September 21, 2011 (the "Open Letter"), stating that "any person who uses . . . marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use for medicinal purposes, is an unlawful user of . . . a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition."  *See* First Amended Complaint ("FAC"), Dkt. No. 34, Ex. 2-B.  The Open Letter further informed FFLs that "if you are aware that the potential transferee is in possession of a card authorizing the possession and use of marijuana under State law, then you have 'reasonable cause to believe' that the person is an unlawful user of a controlled substance" and "you may not transfer firearms or ammunition to the person."  *Id.* (quoting 18 U.S.C. § 922(d)(3)).

Plaintiff S. Rowan Wilson's First Amended Complaint cannot correct the deficiencies that doomed her original Complaint, and her newly asserted claims fare no better.  Plaintiff alleges that she possesses a medical marijuana card issued by the State of Nevada and has been prevented from purchasing a handgun.  She claims that Defendants—through § 922(g)(3), § 922(d)(3), an ATF regulation defining certain statutory terms, and the Open Letter—have prohibited her from exercising her Second Amendment rights.  She also challenges Defendants' actions under the First Amendment, as well as the Due Process and Equal Protection clauses of the Fifth Amendment.  Plaintiff seeks a declaratory judgment, a permanent injunction, and monetary damages, but she has failed to state a claim for which relief can be granted.

As a preliminary matter, Plaintiff lacks standing.  The medical marijuana registry card issued by the State of Nevada attached to Plaintiff's FAC expired on March 10, 2012.  She therefore cannot challenge any of the laws or policies that would inhibit a holder of a valid registry card from obtaining a firearm, mandating dismissal of the amended pleading.  Even if

---

[1] As discussed herein, *see infra* at 4-5, the federal government does not recognize a medical use for marijuana.  Any use in this memorandum of terms such as "medical marijuana," "medical use," or "for medical purposes" should not be read to suggest otherwise.

she had a valid card, she cannot satisfy the traceability or redressability elements of standing because her harm is self-inflicted and her conduct would still be prohibited under Nevada law.

Even if the Court were to reach the merits of the FAC, each claim would fail. The Ninth Circuit's decision in *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011), squarely forecloses Plaintiff's Second Amendment challenge to § 922(g)(3) and imperils the remainder of the Second Amendment challenge she asserts. Moreover, if this Court were to engage in an independent Second Amendment analysis, dismissal would still be warranted, as unlawful drug users are not within the class of law-abiding, responsible citizens historically protected by the Second Amendment, and § 922(g)(3) survives any level of scrutiny in any event. Section 922(d)(3) survives for the same reasons, along with the fact there is no recognized constitutional right to sell firearms. And ATF's regulation and the Open Letter survive for all of the reasons that § 922(g)(3) and § 922(d)(3) survive.

Plaintiff's other constitutional challenges must similarly be dismissed. Plaintiff's First Amendment claim fails because possessing a medical marijuana card cannot be considered "expressive conduct" equivalent with speech, and in any event, any limitation on First Amendment freedoms are incidental to the important government interest underlying the restrictions on the sale of firearms to illegal drug users. Plaintiff's substantive and procedural due process claims merge with the First and Second Amendment claims, and do not adequately set forth any due process violation. Plaintiff's equal protection claim fails to allege a proper classification of a group against whom Defendants have discriminated. Finally, even if Plaintiff had stated a claim against the Defendants, no waiver of sovereign immunity allows her to recover monetary damages from the United States, as Plaintiff conceded earlier in this litigation. The Court should therefore dismiss the FAC in its entirety.

## STATUTORY AND REGULATORY BACKGROUND

## I.   THE GUN CONTROL ACT AND THE CONTROLLED SUBSTANCES ACT

The Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1220, included a provision—now codified at 18 U.S.C. § 922(g)—designed "to keep firearms out of the hands of presumptively risky people," including felons, the mentally ill, fugitives from justice, and

1  unlawful drug users.  *Dickerson v. New Banner Inst.*, 460 U.S. 103, 112 n.6 (1983).  Specifically,

2  as applied to unlawful drug users, § 922(g)(3) provides that

> [i]t shall be unlawful for any person . . . who is an unlawful user of or addicted to
> any controlled substance (as defined in section 102 of the Controlled Substances
> Act (21 U.S.C. § 802)) . . . to . . . possess in or affecting commerce, any firearm or
> ammunition; or to receive any firearm or ammunition which has been shipped or
> transported in interstate or foreign commerce.

6  18 U.S.C. § 922(g)(3).  To help effectuate the firearm exclusions in § 922(g), Congress also

7  banned selling firearms to the same categories of presumptively risky people.  As relevant here,

8  § 922(d)(3) makes it

> unlawful for any person to sell or otherwise dispose of any firearm or ammunition
> to any person knowing or having reasonable cause to believe that such person . . .
> is an unlawful user of or addicted to any controlled substance (as defined in
> section 102 of the Controlled Substances Act (21 U.S.C. § 802)).

12  *Id.* § 922(d)(3).

13       In addition to challenging the constitutionality of these two provisions, Plaintiff also

14  targets 27 C.F.R. § 478.11, a regulation issued by ATF to define certain statutory terms.

15  Specifically, the regulation defines an "[u]nlawful user of or addicted to any controlled

16  substance" as

> [a] person who uses a controlled substance and has lost the power of self-control
> with reference to the use of the controlled substance; and any person who is a
> current user of a controlled substance in a manner other than as prescribed by a
> licensed physician.  Such use is not limited to the use of drugs on a particular day,
> or within a matter of days or weeks before, but rather that the unlawful use has
> occurred recently enough to indicate that the individual is actively engaged in such
> conduct.  A person may be an unlawful current user of a controlled substance even
> though the substance is not being used at the precise time the person seeks to
> acquire a firearm or receives or possesses a firearm.  An inference of current use
> may be drawn from evidence of a recent use or possession of a controlled substance
> or a pattern of use or possession that reasonably covers the present time . . . .

23  27 C.F.R. § 478.11.  Additionally, the regulation echoes §§ 922(g)(3) and 922(d)(3) by

24  providing that a "controlled substance" is "[a] drug or other substance, or immediate

25  precursor, as defined in . . . 21 U.S.C. § 802."  *Id.*

26       Section 102 of the Controlled Substances Act, in turn, defines "controlled substance" as

27  "a drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, or V or

28  part B of this title [21 U.S.C. § 812]."  21 U.S.C. § 802(6).  Since the enactment of the

4

Controlled Substances Act, marijuana (also known as cannabis) has been classified as a Schedule

I drug.  21 U.S.C. § 812(c), Schedule I(c)(10).  By classifying marijuana as a Schedule I drug,

Congress has determined that marijuana "has a high potential for abuse," that it "has no currently

accepted medical use in treatment in the United States," and that "[t]here is a lack of accepted

safety for use of [marijuana] under medical supervision."  *Id.* § 812(b)(1)(A)-(C).[2]  As such,

Schedule I drugs, including marijuana, cannot be legally prescribed for medical use.  *See* 21

U.S.C. § 829; *see also United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491

(2001) ("Whereas some other drugs can be dispensed and prescribed for medical use, . . . the

same is not true for marijuana.").  Additionally, it is generally unlawful for any person to

knowingly or intentionally possess marijuana.  *See* 21 U.S.C. § 844(a).  For Schedule I drugs like

marijuana, the only exception to this ban on possession is for a federally approved research

project.  *See* 21 U.S.C. § 823(f); *see also Gonzales v. Raich*, 545 U.S. 1, 14 (2005) ("By

classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the . . .

possession of marijuana became a criminal offense, with the sole exception being use of the drug

as part of a Food and Drug Administration pre-approved research study.").

## II.     NEVADA'S LAW REGARDING THE USE OF MARIJUANA

Separate and apart from federal law, the State of Nevada also criminalizes the possession

of marijuana.  *See* Nev. Rev. Stat.  §§ 453.336.  In 2000, however, Nevada's Constitution was

amended by initiative petition to add the following provision regarding the medical use of

marijuana:

> The legislature shall provide by law for . . . [t]he use by a patient, upon the advice
> of his physician, of a plant of the genus Cannabis for the treatment or alleviation
> of cancer, glaucoma, acquired immunodeficiency syndrome; severe, persistent
> nausea of cachexia resulting from these or other chronic or debilitating medical
> conditions; epilepsy and other disorders characterized by seizure; multiple

---

[2] The Controlled Substances Act delegates authority to the Attorney General to reschedule controlled substances after consulting with the Secretary of Health and Human Services.  *Id.* § 811.  The Department of Justice's Drug Enforcement Agency ("DEA") has repeatedly denied petitions to have marijuana removed from Schedule I, most recently in 2011.  *See* Notice of Denial of Petition, 76 Fed. Reg. 40552 (July 8, 2011); *see also Gonzales v. Raich*, 545 U.S. 1, 15 & n.23 (2005).  Based largely on scientific and medical evaluations prepared by the Department of Health and Human Services, DEA has consistently found that marijuana continues to meet the criteria for Schedule I control.  *See* 76 Fed. Reg. at 40552.

sclerosis and other disorders characterized by muscular spasticity; or other conditions approved pursuant to law for such treatment.

Nev. Const. art. IV, § 38(a). Pursuant to this constitutional amendment, Nevada enacted legislation in 2001 that exempts the use of marijuana from state prosecution in certain circumstances. *See* Nev. Rev. Stat. § 453A. Subject to certain exceptions, the law provides that "a person who holds a valid registry identification card . . . is exempt from state prosecution for . . . [a]ny . . . criminal offense in which the possession, delivery or production of marijuana . . . is an element." Nev. Rev. Stat. § 453A.200(1)(f).[3] This exemption only applies to the extent that the holder of a registry identification card: (i) engages in "the medical use of marijuana in accordance with the provisions of this chapter as justified to mitigate the symptoms or effects of the person's chronic or debilitating medical condition;" and (ii) "do[es] not, at any one time, collectively possess, deliver or produce more than . . . one ounce of usable marijuana, three mature marijuana plants, and four immature marijuana plants." *Id.* § 453A.200(3).

The law also specifies who is eligible to receive a state-issued registry identification card, requiring applicants to provide, *inter alia*, "[v]alid, written documentation from the person's attending physician stating that . . . [t]he person has been diagnosed with a chronic or debilitating medical condition." *Id.* § 453A.210(2)(a)(1).[4] An applicant must also provide documentation from his or her physician stating that "[t]he medical use of marijuana may mitigate the symptoms or effects of that condition" and that "[t]he attending physician has explained the possible risks and benefits of the medical use of marijuana." *Id.* § 453A.210(2)(a)(2)–(3). The state-issued registry identification card is valid for one year and must be renewed by annually submitting updated written documentation from the cardholder's attending physician, including proof that the individual continues to suffer from a chronic or debilitating medical condition. *Id.* §§ 453A.220(4), 453A.230. If a cardholder is "diagnosed by the person's attending physician as

---

[3] The statute specifies, however, that cardholders are not exempt from state prosecution for a number of other crimes related to marijuana use. *Id.* § 453A.300(1).

[4] The statute defines the term "chronic or debilitating medical condition" to include AIDS, cancer, and glaucoma, as well as "[a] medical condition or treatment for a medical condition that produces, for a specific patient," one or more of the following symptoms: (i) cachexia, (ii) persistent muscle spasms, (iii) seizures, (iv) severe nausea, or (v) severe pain. Nev. Rev. Stat. § 453A.050.

no longer having a chronic or debilitating medical condition, the person . . . shall return the[] registry identification card[] to the [State] within 7 days after notification of the diagnosis." *Id.* § 453A.240.

Nevada's law governing the medical use of marijuana does not purport to "legalize" medical marijuana, but rather specifies the limited circumstances under which the possession of limited amounts of marijuana for purported medical use is exempt from state prosecution.  This fact is evidenced by the overall structure of the statute and by the act's inclusion of a directive instructing the next session of the Nevada legislature to "review statistics provided by the legislative counsel bureau with respect to . . . [w]hether persons exempt from state prosecution [under] this act have been subject to federal prosecution for carrying out the activities concerning which they are exempt from state prosecution pursuant to [the act]."  Act of June 14, 2001 (Assembly Bill 453), ch. 592, § 48.5.  Along these lines, a one-page "Important Notice" posted on the State of Nevada's Department of Health and Human Services, Health Division's website advises the public that "**ISSUANCE OF A STATE OF NEVADA MEDICAL MARIJUANA REGISTRY CARD DOES NOT EXEMPT THE HOLDER FROM PROSECUTION UNDER FEDERAL LAW**."  *See* Nev. State Health Div., *Important Notice* (Feb. 12, 2009), http://health.nv.gov/PDFs/MMP/ImportantNotice.pdf (emphasis in original) [App.[5] at Tab 1]; Nev. State Health Div., *Program Facts* 2 (Feb. 12, 2009), http://health.nv.gov/PDFs/MMP/ ProgramFacts.pdf [App. at Tab 2] (stating, in a two-page document posted on the Health Division's website, that "[t]he Medical Marijuana law is a state law, offering protection from state law enforcement only" and that "[t]he federal government does not recognize the state law and is not bound by it.").  A section of the Nevada Health Division's website answering frequently asked questions also informs the public that cardholders cannot fill a prescription for medical marijuana at a pharmacy because "[t]he federal government classifies marijuana as a Schedule I drug, which means licensed medical practitioners cannot prescribe it."  Nev. State Health Div., *Medical Marijuana, Frequently Asked Questions*, No.  8, http://health.nv.gov/

---

[5] Pursuant to Local Rule 7-3, the United States has concurrently filed an appendix to this memorandum containing secondary materials cited herein.

MedicalMarijuana_FAQ.htm (last updated January 17, 2013) [App. at Tab 3]. The frequently asked questions page also specifies that a patient may withdraw from the program by submitting a written statement indicating that he or she wishes to withdraw and by returning the individual's registry identification card. *Id.*, No. 12.

III.    **ATF'S SEPTEMBER 2011 OPEN LETTER TO FFLS**

On September 21, 2011, ATF issued an "Open Letter to All Federal Firearms Licensees." *See* FAC, Ex. 2-B. The Open Letter first notes that ATF "has received a number of inquiries regarding the use of marijuana for medicinal purposes and its applicability to Federal firearms laws" and that the "purpose of this open letter is to provide guidance on the issue and to assist [FFLs] in complying with Federal firearms laws and regulations." *Id.* The Open Letter then observes that "[a] number of States have passed legislation allowing under State law the use or possession of marijuana for medicinal purposes" and that "some of these States issue a card authorizing the holder to use or possess marijuana under State law." *Id.* The Open Letter summarizes the relevant provisions of federal law, noting: (i) that "18 U.S.C. § 922(g)(3)[] prohibits any person who is an 'unlawful user of or addicted to any controlled substance . . .' from shipping, transporting, receiving or possessing firearms or ammunition;" (ii) that the Controlled Substances Act lists marijuana as a Schedule I controlled substance and that "there are no exceptions in Federal law for marijuana purportedly used for medicinal purposes, even if such use is sanctioned by State law;" (iii) that "18 U.S.C. § 922(d)(3)[] makes it unlawful for any person to sell or otherwise dispose of any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is an unlawful user of or addicted to a controlled substance;" and (iv) that, under 27 C.F.R. § 478.11, "'an inference of current use may be drawn from evidence of a recent use or possession of a controlled substance or a pattern of use or possession that reasonably covers the present time.'" FAC, Ex. 2-B.

The Open Letter draws two conclusions from these provisions: first, "any person who uses or is addicted to marijuana, regardless of whether his or her State has passed legislation authorizing marijuana use for medicinal purposes, is an unlawful user of or addicted to a controlled substance, and is prohibited by Federal law from possessing firearms or ammunition."

1   *Id.*  Second, if an FFL is "aware that the potential transferee is in possession of a card authorizing

2   the possession and use of marijuana under State law, then [the FFL] ha[s] 'reasonable cause to

3   believe' that the person is an unlawful user of a controlled substance" and "may not transfer

4   firearms or ammunition to the person."  *Id.*  This holds even if the potential transferee answered

5   "no" to Question 11(e) on ATF Form 4473,[6] which asks, "Are you an unlawful user of, or

6   addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled

7   substance?"  *Id.*; *see also* FAC., Ex. 2-C.

8                                    **PROCEDURAL HISTORY**

9           Plaintiff filed her original complaint on October 18, 2011.  Dkt. No. 1.  Defendants

10   moved to dismiss on February 3, 2012.  Dkt. No. 10.  The Court held a hearing on Defendants'

11   motion on November 2, 2012.  After the hearing, the parties filed a stipulation allowing Plaintiff

12   to file a First Amended Complaint.[7]  Plaintiff filed the amended pleading on December 17, 2012.

13   Dkt. No. 34.

14           The facts alleged in Plaintiff's Complaint are accepted as true for purposes of the

15   Defendants' Motion to Dismiss.  According to the First Amended Complaint, Plaintiff applied for

16   a medical marijuana registry card from the State of Nevada in October 2010.  FAC ¶ 39.  Since

17   the age of ten, Plaintiff has experienced severe menstrual cramps, which she describes as

18   "sometimes debilitating, even leading to further painful side effects, such as severe nausea and

19   cachexia." FAC, Ex. 1, ¶ 20.  As part of her application for a medical marijuana registry card,

20   Plaintiff obtained a recommendation from her doctor to use marijuana.  FAC ¶ 40; Ex. 2.

21   Plaintiff then submitted that recommendation, along with the appropriate paperwork, to the State

22   _____

23   [6] ATF Form 4473 is a firearms transaction record that all potential purchasers are required to
    complete before receiving a firearm from an FFL.  *See* 27 C.F.R. § 478.124.

24   [7] At the November 2, 2012 hearing, the Court granted the parties' request for supplemental
    briefing on four issues.  Because the parties agreed to allow Plaintiff to amend her complaint, the
    Court ordered the parties to address these issues in the motion to dismiss briefing.  *See* Dkt No.
25   33.  Defendants have addressed the questions in the present memorandum as follows: the level of
    scrutiny for Second Amendment challenges after *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012)
26   (*en banc*) is addressed at page 24; the level of deference that should be afforded to the Open
    Letter, and whether the Letter is interpretive or legislative, is addressed at page 35; whether
27   Plaintiff has standing to assert a claim challenging § 922(d)(3) is addressed at page 11, n.9; and
    whether Plaintiff's claim is "ripe" because she did not answer the question on the ATF Form
28   4473 asking whether she was an unlawful drug user is addressed at page 11, n.9.

                                                9

of Nevada.  Ex. 1 ¶ 22.  On May 12, 2011, Nevada issued a registry identification card to Plaintiff.  FAC ¶ 41; *see also* FAC, Ex. 1-B.

On October 4, 2011, Plaintiff visited Custom Firearms & Gunsmithing, a federally licensed gun store in Moundhouse, Nevada, to purchase a handgun.  In order to effect the transaction, Plaintiff began to complete ATF Form 4473, but did not answer Question 11(e) ("Are you an unlawful user of, or addicted to, marijuana, or any depressant, stimulant, or narcotic drug, or any other controlled substance?").  *See* FAC, Ex. 1-C.  Plaintiff alleges that her "natural inclination" was to answer "no" to Question 11(e), FAC ¶ 46, but that "it had been brought to [her] attention that ATF had "promulgated a policy whereby any person holding a medical marijuana registry card is automatically considered an 'unlawful user of, or addicted to marijuana.'" FAC Ex. 1 ¶ 30.  For that reason, she left Question 11(e) blank.  FAC Ex. 1 ¶ 31.  When Plaintiff provided the form to Mr. Frederick Hauseur, the store's proprietor, he informed her that he was prohibited from selling her any firearm or ammunition.  FAC Ex. 1, ¶ 32.  Mr. Hauseur and Plaintiff had known each other for nearly a year, and Mr. Hauseur was previously aware that Plaintiff possessed a state-issued medical marijuana registry card.  *Id.*; FAC Ex. 2, ¶ 11.  With that knowledge, Mr. Hauseur "refused to sell Ms. Wilson the firearm that she requested on the grounds that she was an 'unlawful user of a controlled substance.'" FAC Ex. 2, ¶ 13.  Plaintiff alleges that she "presently intends to acquire a functional handgun for use within her home for self-defense but is prevented from doing so" by federal law, as implemented by ATF.  FAC ¶ 6.

Defendants have moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(1) because Plaintiff lacks standing.  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1040 (9th Cir. 2003).  If the Court were to reach the merits, Defendants have moved to dismiss under Rule 12(b)(6), which requires dismissal if the Complaint fails to state a claim upon which relief can be granted.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[8]

---

[8] If the Court determines that it can only dismiss the Complaint by relying on the extrinsic sources referenced in Parts II.A.2. and II.A.3., *infra*, then the Court should treat Defendants' motion as a Motion for Summary Judgment under Rule 56.  To facilitate that, Defendants attach a Statement of Undisputed Facts in compliance with Local Rule 56-1.

# ARGUMENT

## I.   PLAINTIFF LACKS STANDING TO CHALLENGE THE STATUTES, THE REGULATION, AND ATF'S OPEN LETTER

To establish standing under Article III, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiff fails to establish each of the requirements.[9]  The FAC should accordingly be dismissed in its entirety, and the Court need not reach Plaintiff's constitutional claims.  *Shaw v. Terhune* 380 F.3d 473, 478 (9th Cir. 2004) (noting the "canonical admonition" that courts must "avoid considering constitutionality if an issue may be resolved on narrower grounds").

---

[9] At the November 2, 2012 hearing on Defendants' motion to dismiss the original complaint, the Court asked the parties to brief whether Plaintiff, as an attempted purchaser and not a *seller* of firearms, had standing to challenge § 922(d)(3).  Plaintiff lacks standing to challenge § 922(d)(3) for the three reasons set forth in this Section.  But if she overcame these hurdles, the standing doctrine would likely not preclude Plaintiff's challenge to § 922(d)(3).  Though the statute is directed primarily at sellers, the scope of the prohibition on sales to unlawful drug users is a mirror image of the prohibition on receipt and possession of firearms by unlawful drug users in § 922(g)(3).  At least one court has found that in that circumstance, where a statutory scheme effectively prohibits an individual from receiving and a seller from selling a firearm, a plaintiff may have standing to challenge both statutes.  *See, e.g.*, *Dearth v. Holder*, 641 F.3d 499, 500-03 (D.C. Cir. 2011) (finding that plaintiff had standing to challenge both § 922(a)(9), which prohibits a non-resident from receiving a firearm, and § 922(b)(3), which prohibits the sale of a firearm to a non-resident).

The Court also asked the parties to address whether the fact that Plaintiff failed to answer Question 11e on Form 4473 means that the case is not ripe. Tr. at 72:2-4.  At the hearing, counsel for Plaintiff represented (incorrectly) that Mr. Hauser had stated in his declaration that he had "stopped" Plaintiff from answering Question 11e on Form 4473.  *See* Tr.  at 58:10-59:1.  In fact, Mr. Hauseur's declaration—identical versions of which are attached to Plaintiff's original complaint and the FAC—contains no such statement.  Rather, Mr.  Hauseur states that he knew that Plaintiff possessed a registry card, and therefore "refused to sell Ms. Wilson the firearm that she requested *on the grounds that she was an 'unlawful user of a controlled substance*.'"  FAC Ex. 2 ¶ 13 (emphasis added).  That said, whether or not Mr. Hauseur stopped her from answering the question is immaterial to the ripeness question in this case.  The Open Letter states that "if you are aware that the potential transferee is in possession of a [medical marijuana registry card], then you have 'reasonable cause to believe' that the person is an unlawful user" of illegal drugs. FAC Ex. 2-B.  Mr.  Hauseur knew that Plaintiff had a card, and as a result, he denied her attempt to purchase a firearm.  The answer (or lack thereof) to Question 11e is therefore irrelevant in this case and does not pose a ripeness problem.

## A. Plaintiff Cannot Establish the "Injury in Fact" Requirement Because She Lacks a Valid Medical Marijuana Card

Each of Plaintiff's causes of action rests on a common allegation: that Plaintiff, as a holder of a state-issued medical marijuana registry card, cannot obtain a firearm.  But according to the documents attached to Plaintiff's declaration, Plaintiff does not currently possess a valid medical marijuana registry card.  That card expired on March 10, 2012.  *See* FAC Ex. 1 at 10.

In order to satisfy the "injury in fact" requirement for standing in cases such as this, where declaratory and injunctive relief are sought, Plaintiff must show that she is suffering an ongoing injury or faces an immediate threat of injury.  *See Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); 28 U.S.C. § 2201 (proceeding under the Declaratory Judgment Act requires "a case of actual controversy").  Past wrongs are insufficient to confer standing for purposes of obtaining injunctive relief.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 109 (1998).  Because the only apparent impediment to Plaintiff's ability to obtain a firearm has been removed since March 2012, Plaintiff is not suffering an ongoing injury, and the operative pleading lacks an "actual controversy."  Plaintiff therefore lacks standing to challenge the statutes, regulation, and the Open Letter, and the First Amended Complaint should be dismissed in its entirety.[10]

---

[10] Plaintiff cannot cure this standing defect by arguing that an FFL could use the months-expired registration card as evidence of "current use" of marijuana.  If an FFL were to do so, the injury would then be traceable to the FFL, and not the Government.  In addition to establishing injury in fact, a plaintiff bears the burden of establishing a causal connection between the injury and the conduct complained of, as well as a likelihood that the injury would be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560-61.  The Open Letter states that an FFL who is "aware that the potential transferee is in possession of a card authorizing the possession and use of marijuana under State Law" has "reasonable cause to believe" that the person is an unlawful user.  FAC, Ex. 2-B.  An expired card is not "a card authorizing the possession and use of marijuana."  If an FFL used the expired card to justify the denial of sale, Plaintiff's injury would stem from the actions of the FFL, not the Government.  *See San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (holding that plaintiff lacked standing to challenge legislation that, by banning certain guns, resulting in dealers raising prices on guns the plaintiffs wanted to purchase, because "nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons") (citing *Lujan*, 504 U.S. at 560); *Lane v. Holder*, 2012 WL 6734784, at *4 (4th Cir. Dec. 31, 2012) (finding that any harm to potential firearms purchasers created by transfer fees imposed by FFLs "result[] from the actions of third parties not before this court, [and as such] plaintiffs are unable to demonstrate traceability").  Because the purported injury would not be directly linked to Defendants' actions, the causation and redressability prongs of Article III standing would not be met.

### B. Plaintiff Cannot Satisfy the Traceability Elements of Standing Because Her Injury is Self-Inflicted

Even if Plaintiff had a valid registry card, she would still lack standing because her injury is self-inflicted. Because Plaintiff's past inability to acquire a firearm stemmed from her own decision to retain her card, any injury she suffers is traceable not to Defendants, but to her own decisionmaking, and is therefore insufficient to confer standing to prosecute her claims. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (finding that "self-inflicted injuries" failed to meet causation element of standing); *Nat'l Family Planning & Reproductive Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) ("[S]elf-inflicted harm doesn't satisfy the basic requirements for standing."); *cf. Yancey*, 621 F.3d at 687 (because § 922(g)(3) extends only to current users, "[defendant] himself controls his right to possess a gun; the Second Amendment, however, does not require Congress to allow him to simultaneously choose both gun possession and drug abuse"). The existence of a viable alternative to the alleged injury is significant, because "Article III standing ultimately turns on whether a plaintiff gets something other than moral satisfaction if the plaintiff wins." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 122 (2d Cir. 2009) (internal citation and punctuation omitted); *Fire Equip. Mfrs. Ass'n v. Marshall*, 679 F.2d 679, 682 n.5 (7th Cir. 1982) ("[P]etitioners cannot allege an injury from one of the options where they can choose another which causes them no injury."). Individuals who hold valid state-issued medical marijuana cards are either unlawful drug users or are holding cards that serve them no purpose. These individuals have a choice: they can either retain their Nevada-issued medical marijuana card and forfeit the right to acquire a firearm, or they can refrain from using marijuana, return their card to the State, and regain the right to acquire a firearm. Either way, individuals such as Plaintiff cannot seek an injunction or declaratory relief against the Government for an injury entirely of their own design.

### C. Plaintiff Cannot Satisfy the Traceability or Redressability Elements of Standing Because She Has Not Challenged Nevada's Prohibition on the Possession of a Firearm by an "Unlawful User"

Under Nevada law, "[a] person shall not own or have in his or her possession or under his or her custody or control any firearm if the person . . . [i]s an unlawful user of, or addicted to,

13

1   any controlled substance." Nev. Rev. Stat. § 202.360(1)(c).[11] Like § 922(g)(3), the Nevada

2   statute defines "controlled substance" in terms of the Controlled Substances Act. *Id.*

3   § 202.360(3)(a) (citing 21 U.S.C. § 802(6)). FFLs are prohibited from selling a firearm to an

4   individual "where the purchase *or possession* by such person of such firearm would be in

5   violation of any State law." 18 U.S.C. § 922(b)(2) (emphasis added). Thus, if § 922(g)(3), §

6   922(d)(3), 27 C.F.R. § 478.11, and the Open Letter were all found unconstitutional, Plaintiff still

7   could not possess a firearm under Nevada law or purchase a firearm from an FFL under §

8   922(b)(2). Plaintiff therefore cannot show that her alleged harm is caused by operation of the

9   challenged federal laws. Nor would a favorable decision by this Court redress Plaintiff's claimed

10   Second Amendment injury.[12]

11        First, Plaintiff's injury—the inability to obtain a firearm—is not "fairly traceable" to

12   Defendants' conduct. In analyzing traceability, courts must determine whether "the line of

13   causation between the illegal conduct and injury [is] too attenuated." *Allen v. Wright*, 468 U.S.

14   737, 752 (1984). As relevant here, both Federal and Nevada law prohibit possession of a firearm

15   by an "unlawful user" of a controlled substance. The state law prohibition undercuts the

16   argument that Plaintiff's injury is traceable strictly to the challenged federal laws and not "th[e]

17   result [of] the independent action of some third party not before the court." *Lujan v. Defenders*

18   *of Wildlife*, 504 U.S. 555, 560 (1992); *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121,

19   1130 (9th Cir. 1996) (the presence of state law banning conduct similar to conduct addressed by

20   a federal law undermined traceability);[13] *see also Pritikin v. Department of Energy*, 254 F.3d 791,

21   _____

22   [11] *Gallegos v. State*, 163 P.3d 456 (Nev. 2007), invalidated paragraph b of NRS 202.360(1) as unconstitutionally vague because it did not define "fugitive from justice." That holding does not affect the section at issue here, NRS 202.360(1)(c). *See Pohlabel v. State*, 268 P.3d 1264, 1265 n.1 (Nev. 2012) (recognizing that paragraphs within NRS 202.360(1) other than NRS 202.360(1)(b) were not invalidated by *Gallegos*).

23   

24   [12] According to the Supreme Court, the "fairly traceable" and "redressability" components of standing are two distinct "facets of a single causation requirement." *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984). "To the extent there is a difference, it is that the former examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the latter examines the causal connection between the alleged injury and the judicial relief requested." *Id.*

25   

26   

27   [13] Though *San Diego County Gun Rights Committee* predates *Heller*, the Ninth Circuit's conclusion that the plaintiffs' alleged injuries were not "fairly traceable" to the challenged federal law, 98 F.3d at 1130, is unaffected by *Heller*'s analysis.

28   

14

797 (9th Cir. 2001) (private citizen suing the Department of Energy and individual governmental officers to compel funding of medical monitoring program failed to meet Article III standing on the traceability and redressability prongs because another agency, not before the court, decides whether to implement the program).

Second, an order from this Court granting Plaintiff's requested relief would not redress Plaintiff's alleged injuries.  If the Court invalidated the federal statutes, the regulation and the Open Letter, the Nevada law prohibiting possession of a firearm by an "unlawful user" would remain intact, as would the requirement that FFLs could not sell a firearm to someone violating state law.  *See White v. United States*, 2009 WL 173509 at *5 (S.D. Ohio Jan. 26, 2009) (holding that plaintiffs' injury was not caused by the Animal Welfare Act, as cockfighting was banned in all fifty states); *see also Midwest Media Prop. L.L.C. v. Symmes Twp*., 503 F.3d 456, 461-63 (6th Cir. 2007) (finding that plaintiffs failed to establish redressability when they challenged township's zoning regulations prohibiting off-premises signs, because plaintiffs' rejected applications for off-premises signs had been, or could have been, rejected for violations of township's height/size restrictions and plaintiffs had not challenged those restrictions); *cf. San Diego County Gun Rights*, 98 F.3d at 1130.  Because there is an additional barrier to Plaintiff possessing or purchasing a handgun, the Court cannot redress her alleged injury in this lawsuit.

## II.   PLAINTIFF'S SECOND AMENDMENT RIGHTS HAVE NOT BEEN VIOLATED

Even if Plaintiff had standing to bring her claims, each would fail.  Her Second Amendment claims fail because the Ninth Circuit has held that Congress did not violate the Second Amendment by prohibiting unlawful drug users from possessing firearms.  *See United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011).  This binding holding applies to all unlawful drug users, even those whose marijuana use is exempt from state prosecution.  Even if the Ninth Circuit had not already upheld 18 U.S.C. § 922(g)(3) against a Second Amendment challenge, Plaintiff's challenge to this provision would still fail because it proscribes activity that falls outside the scope of the Second Amendment's protections.  In any event, because prohibiting possession of firearms by unlawful drug users, including marijuana users, substantially relates to the important governmental interests in combatting violent crime and protecting public safety, 18

U.S.C. § 922(g)(3) does not violate Plaintiff's Second Amendment rights.  Plaintiff's challenge

to § 922(d)(3) similarly fails, as the Second Amendment does not protect a right to sell firearms.

Moreover, because § 922(g)(3)—which prohibits unlawful drug users' firearm *possession*—does

not violate the Second Amendment, the fact that § 922(d)(3) might prevent unlawful drug users

from *acquiring* firearms does not render that provision constitutionally suspect.  Finally, for the

same reasons that § 922(g)(3) and § 922(d)(3) do not violate the Second Amendment, ATF's

regulation defining terms in the two statutes and the agency's interpretation of the laws in the

Open Letter are also constitutional.  In particular, the interpretation of these statutes as set forth

in the Open Letter is entirely reasonable and properly tailored to the compelling government

interests at issue here.

### A. 18 U.S.C. § 922(g)(3), as Implemented and Interpreted by ATF, Does Not Violate the Second Amendment.

#### 1. Plaintiff's Second Amendment Challenge to § 922(g)(3) is Foreclosed by the Ninth Circuit's Decision in *Dugan*.

The Second Amendment provides: "A well-regulated Militia, being necessary to the

security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), after determining

that the Second Amendment confers an individual right to keep and bear arms, *Id.* at 595, the

Supreme Court held that "the District's ban on handgun possession in the home violates the

Second Amendment, as does its prohibition against rendering any lawful firearm in the home

operable for the purpose of immediate self-defense."  *Id.* at 635.  The Court's holding was

narrow and addressed only the "core" right of "law-abiding, responsible citizens to use arms in

defense of hearth and home." *Id.* at 634–35 (emphasis added).

The Supreme Court also took care to note that, like other constitutional rights, the right to

keep and bear arms is "not unlimited." *Id.* at 626.  Although the Supreme Court declined to

"undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment," it

cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill . . . or laws imposing

conditions and qualifications on the commercial sale of arms." *Id.* at 626-27.  The Court clarified

that it was "identify[ing] these presumptively lawful regulatory measures only as examples" and that its list was not "exhaustive." *Id.* at 627 n.26; *see also McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010).

Following *Heller*, numerous Second Amendment challenges have been raised against § 922(g)(3), and not one has succeeded. *See, e.g.*, *United States v. Yancey*, 621 F.3d 681, 683, 687 (7th Cir. 2010) (holding that § 922(g)(3) was "equally defensible" as, and analogous to, the categorical bans described as presumptively lawful in *Heller* and that "Congress acted within constitutional bounds by prohibiting illegal drug users from firearm possession because it is substantially related to the important governmental interest in preventing violent crime."); *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) ("find[ing] that § 922(g)(3) is the type of 'longstanding prohibition[] on the possession of firearms' that Heller declared presumptively lawful"); *United States v. Richard*, 350 F. App'x 252, 260 (10th Cir. 2009) (unpublished); *see also United States v. Patterson*, 431 F.3d 832, 835–36 (5th Cir. 2005) (holding, pre-*Heller*, that although the Fifth Circuit recognized an individual right to bear arms, a criminal defendant's Second Amendment challenge to § 922(g)(3) was unavailing.[14]

The Ninth Circuit similarly upheld § 922(g)(3) against a Second Amendment challenge in *Dugan*. Like other courts that have considered the issue, the Ninth Circuit found significant *Heller*'s language describing the presumptive lawfulness of § 922(g)(1)'s prohibition on firearm possession by felons and § 922(g)(4)'s prohibition on firearm possession by the mentally ill. *Dugan*, 657 F.3d at 999. The Ninth Circuit found that "the same amount of danger" is presented by allowing habitual drug users to possess firearms because "[h]abitual drug users, like career criminals and the mentally ill, more likely will have difficulty exercising self-control,

---

[14] *United States v. Carter*, 669 F.3d 411 (4th Cir. 2012), is not to the contrary. There, the Fourth Circuit found that the government had failed to meet its burden of establishing a record showing a reasonable fit between § 922(g)(3) and the government's important interest in public safety, and it therefore remanded to allow the government an opportunity to substantiate the record. The Court said that to do so "should not be difficult." *Id.* at 419. On remand, the United States "shouldered its burden of establishing that section 922(g)(3) is reasonably fitted to achieve the substantial government objective of protecting the community from crime by keeping guns out of the hands of those impaired by their use of controlled substances." *United States v. Carter*, 2012 WL 5935710, at *7 (S.D. W. Va. Nov. 27, 2012).

17

particularly when they are under the influence of controlled substances." *Id.* The court also found an important distinction between § 922(g)(3) and the two prohibitions declared presumptively lawful by *Heller* that actually favored § 922(g)(3)'s constitutionality—namely, that "an unlawful drug user may regain his right to possess a firearm simply by ending his drug abuse," whereas those individuals who have been convicted of a felony or committed to a mental institution generally face a lifetime ban. *Id.* The court therefore concluded that "[b]ecause Congress may constitutionally deprive felons and mentally ill people of the right to possess and carry weapons . . . Congress may also prohibit illegal drug users from possessing firearms." *Id.*

Although it is not evident from the face of the opinion, Dugan, like Plaintiff, raised arguments relating to his possession of a state-issued card exempting him from state prosecution for using marijuana for medical purposes. *See* Brief for Appellant at 59, *Dugan*, 657 F.3d 998 (No. 08-10579), ECF No. 57 ("Here, Mr. Dugan was . . . licensed to grow and use medical marijuana."). Indeed, Dugan's central argument in his Second Amendment challenge was that "millions of Americans peacefully engage in the unlawful use of marijuana—and millions more do so legally under state medical marijuana laws—without engaging in any behavior that would provide a legitimate basis for excluding them from the reach of the Second Amendment." *Id.* at 57. The Ninth Circuit, however, treated Dugan's status as a medical marijuana cardholder as irrelevant to his Second Amendment claim—and rightly so. Congress has determined that marijuana "has no currently accepted medical use in treatment in the United States," 21 U.S.C. § 812(b)(1)(B), and has accordingly specified that it may not be validly prescribed or lawfully possessed, *Id.* §§ 829, 844(a). Although several states, including Nevada, have taken a different view of marijuana's potential medical benefits, it is well settled that Congress has authority under the Commerce Clause to criminalize marijuana possession, even if such possession is not also illegal under state law. *See Gonzales v. Raich*, 545 U.S. 1 (2005); *see also Raich v. Gonzales* ("*Raich II*"), 500 F.3d 850, 861–64 (9th Cir. 2007) (holding, on remand from the Supreme Court, that there is no Ninth Amendment or substantive due process right to use marijuana for claimed medical purposes). All marijuana users are therefore unlawful users of a controlled substance, and *Dugan*'s holding that Congress may "prohibit illegal drug users from

possessing firearms" without violating the Second Amendment applies equally to all marijuana users.  657 F.3d at 999–1000; *see also United States v. Stacy*, 2010 WL 4117276, at *7 (S.D. Cal. Oct. 18, 2010) (noting, in the course of rejecting a Second Amendment challenge to § 922(g)(3), that "[t]he fact that this particular case involves the alleged lawful use of marijuana under state law does not have any bearing on the presumptively lawful nature of the restriction").  Accordingly, Plaintiff's claim that her Second Amendment rights have been violated by § 922(g)(3) must fail.

> **2.  Even if *Dugan* Did Not Foreclose Plaintiff's Challenge, Her Claim Would Still Fail, Because Unlawful Drug Users, Including Those Who Comply with State Medical Marijuana Laws, Fall Outside the Scope of the Second Amendment.**

Because *Dugan* resolves Plaintiff's Second Amendment challenge to § 922(g)(3), the Court need not undertake an "independent" constitutional analysis of the statute.  *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 778 (2005) (doctrine of constitutional avoidance cautions courts to avoid making unnecessary constitutional determinations).  Nonetheless, even if the Court were to engage in such an analysis, Plaintiff's claim would still fail.

Several courts have established a two-step approach to Second Amendment challenges to federal statutes and regulations.  *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1252-53 (D.C. Cir. 2011) ("*Heller II*"); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).  Under this approach, "[w]e ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny."  *Heller II*, 670 F.3d at 1253.  Plaintiff's claim fails both parts of the analysis because unlawful drug users are not within the class of law-abiding, responsible citizens historically protected by the Second Amendment, and because, in any event, § 922(g)(3) survives the appropriate level of scrutiny.

As noted earlier, *Heller*'s holding was relatively narrow, recognizing only the "core" right of "*law-abiding*, responsible citizens to use arms in defense of hearth and home."  554 U.S. at

634–35 (emphasis added).  Given this narrow holding, as well as the Court's recognition that categorical prohibitions on firearm possession by felons and the mentally ill are presumptively lawful, it is clear that *Heller*'s determination that the Second Amendment confers an individual right to keep and bear arms cannot be misconstrued as recognizing a right for all individuals to possess firearms under any circumstances.  Rather, *Heller*'s carefully crafted articulation of the right at the core of the Second Amendment acknowledges that the Anglo-American right to arms that was incorporated into the Bill of Rights was subject to certain well-recognized exceptions.[15] Given the relatively recent history of federal enactments disqualifying felons and the mentally ill from possessing weapons,[16] *Heller* also teaches that "exclusions [from the right to bear arms] need not mirror limits that were on the books in 1791," when the Second Amendment was enacted.  *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (*en banc*); *see also id.* at 640 ("[*Heller*] tell[s] us that statutory prohibitions on the possession of weapons by some persons are proper—and . . . that the legislative role did not end in 1791.  That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details.") (emphasis in original).  Nevertheless, the history of the right to bear arms as it developed in England and the American colonies is consistent not only with the disarmament of convicted felons and the mentally ill, but also more broadly supports Congress's authority to prohibit firearm possession by non-law-abiding citizens, including those who violate drug laws.

---

[15] It is "perfectly well settled" that the Bill of Rights embodies "certain guaranties and immunities which we had inherited from our English ancestors," and "which had, from time immemorial, been subject to certain well-recognized exceptions, arising from the necessities of the case." *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897).  The Court similarly recognized that "[i]n incorporating these principles into the fundamental law, there was no intention of disregarding the exceptions, which continued to be recognized as if they had been formally expressed." *Id.*; *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 95-96 (1990) (Scalia, J., dissenting) ("The provisions of the Bill of Rights . . . did not create by implication novel individual rights overturning accepted political norms.").

[16] *See Skoien*, 614 F.3d at 640–41 ("The first federal statute disqualifying felons from possessing firearms was not enacted until 1938 . . . .  [T]he ban on possession by all felons was not enacted until 1961. . . .  Moreover, legal limits on the possession of firearms by the mentally ill also are of 20th Century vintage; § 922(g)(4), which forbids possession by a person 'who has been adjudicated as a mental defective or who has been committed to a mental institution,' was not enacted until 1968." (citations omitted)).

*Heller* identified the right protected by the 1689 English Declaration of Rights as "the predecessor to our Second Amendment." 554 U.S. at 593.  This document provided, "That the subjects which are Protestants may have arms for their defense suitable to their conditions and *as allowed by law*." *Id.* (quoting 1 W. & M., c. 2, § 7, in 3 Eng. Stat. at Large 441 (1689)) (emphasis added).  It is undisputed that both before and after its adoption, the English government retained the power to disarm individuals it viewed as dangerous.  *Id.* at 582.  Moreover, "like all written English rights," this right to arms "was held only against the Crown, not Parliament," *id.* at 593, and thus its scope was only "as allowed by law."  Significantly, the English Declaration of Rights did not repeal the 1662 Militia Act, which authorized lieutenants of the militia (appointed by the King) to disarm "any person or persons" judged "*dangerous to the Peace of the Kingdome*," 13 & 14 Car. 2, c. 3, § 1 (1662) (Eng.) (emphasis added), and "was to remain in force with only insignificant changes for many years to come," Joyce Lee Malcolm, *To Keep and Bear Arms* 123 (1994) [App. at Tab 4]; *accord* Patrick J.  Charles, "*Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in* McDonald v. City of Chicago, 57 Clev. State L.  Rev. 351, 373, 376, 382–83, 405 (2009).  Since the act was employed against those viewed as "disaffected or dangerous," Charles, 57 Clev. State L.  Rev. at 376–78, individuals could be disarmed without any adjudication of wrongdoing.

The documentary record surrounding the adoption of the Constitution similarly confirms that the right to keep and bear arms was limited to "law-abiding and responsible" citizens.  In other words, "it is clear that the colonists, at least in some manner, carried on the English tradition of disarming those viewed as 'disaffected and dangerous.'"  *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010).  Notably, "*Heller* identified as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents" (the "Pennsylvania proposal"), which "asserted that citizens have a personal right to bear arms '*unless for crimes committed*, or *real danger of public injury from individuals*.'"  *Skoien*, 614 F.3d at 640 (quoting *Heller*, 554 U.S. at 604; 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971)

(emphasis added)).  "One reason for considering this proposal 'highly influential,' is that it represents the view of the Anti-federalists – the folk advocating . . . for a strong Bill of Rights." *Tooley*, 717 F. Supp. 2d at 590.  This proposal demonstrates that, at the time the Constitution was adopted, even ardent supporters of guaranteeing an individual right to keep and bear arms recognized that criminals and other dangerous individuals should not enjoy its benefits. Although the Second Amendment itself proved more "succinct[]" than the Pennsylvania proposal, *Heller*, 554 U.S. at 659 (Stevens, J., dissenting), the latter remains probative of how the Amendment's supporters viewed the balance between public security and the right to keep and bear arms.  *See id.* at 605 (reaffirming that "the Bill of Rights codified venerable, widely understood liberties").

The Pennsylvania proposal, moreover, supports the view that "the right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue."  Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and Research Agenda*, 56 UCLA L. Rev. 1443, 1497 (2009) ("[A]ny textual or original-meaning limitations on who possesses the right will often stem from the perception that certain people aren't trustworthy enough to possess firearms."); *id.* at 1510 (opining that "those whose judgment is seen as compromised by mental illness, mental retardation, or drug or alcohol addiction have historically been seen as less than full rightholders"); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L.  Rev. 487, 492 (2004); Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 130 (1986).  Additional historical support for this understanding of the right is found in nineteenth-century cases upholding state legislation restricting firearm possession by certain classes of people perceived to be dangerous. For example, the Missouri Supreme Court held in 1886 that a state law prohibiting intoxicated persons from carrying firearms did not violate the state constitutional right to keep and bear arms.  *State v. Shelby*, 2 S.W. 468, 468–69 (Mo. 1886).

Courts interpreting the Second Amendment after *Heller* have recognized the importance of the Amendment's historical limitations. *See, e.g.*, *Heller II*, 670 F.3d at 1252. For example, the First Circuit relied, in part, on historical sources in holding that the right to keep arms does not extend to juveniles. *United States v. Rene E.*, 583 F.3d 8, 15-16 (1st Cir. 2009), *cert. denied*, 130 S. Ct. 1109 (Jan. 11, 2010). The Ninth Circuit has recognized this history as well, noting that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' . . . and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (*i.e.*, criminals)." *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)). This history is sufficient to resolve Plaintiff's challenge to § 922(g)(3). Simply put, unlawful drug users—a category that includes *all* marijuana users—are outside the class of "law-abiding, responsible" citizens historically protected by the Second Amendment. Because the right to keep arms does not extend to those who are actively engaged in illegal activity, § 922(g)(3), as interpreted by ATF, cannot violate the Second Amendment. *See United States v. Hendrix*, 2010 WL 1372663, at *3 (W.D. Wis. Apr. 6, 2010) ("Preventing criminal users of controlled substances from possessing guns is not a restriction on the values that the Second Amendment protects, which, to repeat, is the right of law-abiding citizens to possess handguns in their homes for self-protection.").

### 3. In Any Event, 18 U.S.C. § 922(g)(3) Substantially Relates to the Important Governmental Interest in Protecting Public Safety and Combating Violent Crime.

Even if the Court were to find that § 922(g)(3) impinges upon a right protected by the Second Amendment (or declines to reach the issue), it should still uphold § 922(g)(3), as applied to all marijuana users, because the statute easily survives heightened review. In *Heller*, the Supreme Court did not specify which standard of review should be applied in Second Amendment cases, other than to rule out the use of rational-basis scrutiny. 554 U.S. at 628 & n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). The question of the proper standard of

1    constitutional scrutiny is still unsettled in the Ninth Circuit.  A panel of the Ninth Circuit moved

2    towards resolving this issue by holding that "only regulations which substantially burden the

3    right to keep and to bear arms trigger heightened scrutiny under the Second Amendment,"

4    although declining to decide "precisely what type of heightened scrutiny applies to laws that

5    substantially burden Second Amendment rights."  *Nordyke v. King*, 644 F.3d 776, 786 & n.9 (9th

6    Cir. 2011).  However, that decision was vacated by a subsequent *en banc* decision.  681 F.3d

7    1041 (9th Cir. 2012).  The *en banc* decision specifically declined to adopt a specific level of

8    scrutiny.  *Id.* at 1044-45; *see id.* at 1045 (O'Scannlain, J., concurring in judgment) (noting that

9    the majority "fails to explain the standard of scrutiny" under which it evaluated the Second

10   Amendment challenge).[17]

11        The other courts of appeals that have addressed the standard-of-review issue have

12   uniformly concluded that this type of regulation is, at most, subject to intermediate scrutiny.  The

13   Fourth Circuit, for example, declined to decide whether firearm possession by unlawful drug

14   users was understood to be within the scope of the Second Amendment's guarantee at the time of

15   ratification, but then rejected the defendant's claim that strict scrutiny should apply to his

16   challenge because he purchased the guns at issue for self-defense in the home.  *United States v.*

17   *Carter*, 669 F.3d 411, 416-17 (4th Cir. 2012).  Instead, the court applied intermediate scrutiny,

18   explaining that "[w]hile we have noted that the application of strict scrutiny is important to

19   protect the core right of self-defense identified in *Heller* . . . that core right is only enjoyed, as

20   *Heller* made clear, by 'law-abiding, responsible citizens,'" which unlawful drug users "cannot

21   claim to be." *Id.* at 416.  The court noted that it was "join[ing] the other courts of appeals that

22   have rejected the application of strict scrutiny in reviewing the enforcement of § 922(g)(3), or,

23   for that matter, any other subsection of § 922(g)."  *Id.* at 417.  *See Yancey*, 621 F.3d at 683

24   (applying intermediate scrutiny to uphold § 922(g)(3) against a Second Amendment challenge);

25

26   ─────────────
     [17] The *en banc* opinion arguably held that strict scrutiny would not apply.  As noted by Judge
     O'Scannlain's concurrence, strict scrutiny "requires the government to show that it has taken the
27   least restrictive means to serve a compelling government interest."  *Id.* at 1045 n.2.  Because the
     Government did not have the opportunity to make such a showing, the majority could not have
28   applied strict scrutiny.  *Id.*

1    *see also Marzzarella*, 614 F.3d at 96-97 (applying intermediate scrutiny to 922(k)); *Reese*, 627

2    F.3d at 802 (applying intermediate scrutiny to § 922(g)(8)); *Heller II*, 670 F.3d at 1257 (applying

3    intermediate scrutiny to review novel gun registration laws).

4         Notably, intermediate scrutiny is appropriate here because Plaintiff can avoid the

5    restriction of § 922(g)(3) simply by relinquishing her marijuana registry card and refraining from

6    using marijuana.  The severity of the restriction is therefore not particularly substantial.  *See*

7    *Heller II*, 670 F.3d at 1257 ("[A] regulation that imposes a substantial burden upon the core right

8    of self-defense protected by the Second Amendment must have a strong justification, whereas a

9    regulation that imposes a less substantial burden should be proportionately easier to justify.");

10    *Yancey*, 621 F.3d at 686-87 (because § 922(g)(3) prohibits only *current* drug users from

11    possessing firearms, it is "far less onerous than those affecting felons and the mentally ill").  The

12    weight of this authority confirms that if the Court deems it necessary to apply a constitutional

13    means-end analysis, it should apply no more than intermediate scrutiny.

14         There can be no doubt that § 922(g)(3), as applied to marijuana users, satisfies

15    intermediate scrutiny.  Under intermediate scrutiny, "a regulation must be substantially related to

16    an important governmental objective."  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1134 (9th Cir.

17    2009).  An important—indeed, compelling—governmental interest is at stake here—namely, the

18    government's interest in protecting public safety and preventing violent crime.  *See United States*

19    *v. Salerno*, 481 U.S. 739, 748, 750 (1987) (noting that the Supreme Court has "repeatedly held

20    that the Government's regulatory interest in community safety can, in appropriate circumstances,

21    outweigh an individual's liberty interest" and that the "[g]overnment's general interest in

22    preventing crime is compelling"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate

23    and compelling state interest' in protecting the community from crime cannot be doubted."); *see*

24    *also Carter*, 669 F.3d at 417 ("We readily conclude in this case that the government's interest in

25    'protecting the community from crime' by keeping guns out of the hands of dangerous persons is

26    an important governmental interest."); *Yancey*, 621 F.3d at 684 ("The broad objective of § 922(g)

27    —suppressing armed violence—is without doubt an important one.").

28         In evaluating the fit between the indisputably important objectives at stake and the

prohibition in § 922(g)(3), several relevant considerations affect the analysis.  First, intermediate scrutiny, "by definition, allows [the government] to paint with a broader brush" than strict scrutiny.  *Peruta v. Cnty. of San Diego*, 758 F. Supp. 2d 1106, 1117 (S.D. Cal. 2010) (internal quotation marks and citation omitted).  Second, in order to advance its compelling interests in combating crime and protecting public safety, Congress may need to make "predictive judgments" about the risk of dangerous behavior.  *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 665 (1994).  Such judgments are entitled to "substantial deference" by the courts because Congress is "far better equipped than the judiciary" to collect, weigh, and evaluate the relevant evidence and to formulate appropriate firearms policy in response.  *Id.* at 665–66; *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (legislatures are better equipped to make sensitive policy judgments concerning the "dangers in carrying firearms and the manner to combat those risks").  Third, "the nature and quantity of any showing required by the government 'to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised.'"  *Carter*, 669 F.3d at 418 (quoting *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000)).  Since it is hardly novel—and entirely plausible—that mixing guns and drugs poses a severe risk to public safety, the government's burden here is relatively low.  Finally, the government may carry its burden by relying on "a wide range of sources, such as legislative text and history, empirical evidence, case law, and common sense, as circumstances and context require."  *Id.*

All of these sources point inexorably to the conclusion that a substantial relationship exists between § 922(g)(3), as applied to marijuana users, and Congress's goals of protecting public safety and combatting violent crime.  Congress enacted the precursor to what is now § 922(g)(3) in the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.  Congressional action was prompted by the "increasing rate of crime and lawlessness and the growing use of firearms in violent crime."  H.R. Rep. No. 90-1577, at 7 (1968), *reprinted in* 1968 U.S.C.C.A.N. 4410, 4412.  To meet this growing problem, Congress banned certain classes of individuals from receiving firearms shipped in interstate commerce based on its determination that access to guns by these individuals was generally contrary to the public interest.  *See Huddleston v. United*

*States*, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control legislation . . . was to [curb] crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" (quoting S. Rep. No. 90-1501, at 22 (1968))).  As the House manager stated during debate on the legislation:

> [W]e are convinced that a strengthened [firearms control system] can significantly contribute to reducing the danger of crime in the United States.  No one can dispute the need to prevent drug addicts, mental incompetents, persons with a history of mental disturbances, and persons convicted of certain offenses from buying, owning, or possessing firearms.  This bill seeks to maximize the possibility of keeping firearms out of the hands of such persons.

114 Cong. Rec. 21657, 21784 (1968) (quoted in *Huddleston*, 415 U.S. at 828; *Yancey*, 621 F.3d at 686).  Moreover, Congress evidenced a particular concern with marijuana use: "[w]hile the statute swept in users of several different categories of drugs, marijuana was the only drug specifically listed by name."  *Carter*, 669 F.3d at 417 (citing 82 Stat. 1213, 1220-21, which prohibited receipt of firearms by any person who is "'an unlawful user of or addicted to marihuana or any depressant or stimulant drug . . . or narcotic drug'").[18]

Congress is not the only legislative body to draw the conclusion that guns and drugs do not mix.  Rather, as the court in *Yancey* found significant, "many states have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms."  621 F.3d at 684.[19]  As noted previously, Nevada is among the states that have codified an analogue to § 922(g)(3).  *See* Nev. Rev. Stat. § 202.360(1)(c).  The state legislation "demonstrate[s] that Congress was not alone in concluding that habitual drug abusers are unfit to possess firearms."  *Yancey*, 621 F.3d at 684.

---

[18] As *Carter* notes in recounting § 922(g)(3)'s legislative history, the "the 1968 enactment . . . contained a number of loopholes." *Id.* at 417.  The provision took its current shape with the enactment of the Firearm Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449, 452 (1986).

[19] *See* Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(7), (8); Cal. Penal Code § 12021(a)(1); Colo. Rev. Stat. § 18-12-203(1)(e), (f); Del. Code Ann. tit. 11, § 1448(a)(3); D.C. Code § 22-4503(a)(4); Fla. Stat. § 790.25(2)(b)(1); Ga. Code Ann. § 16-11-129(b)(2)(F), (I), (J); Haw. Rev. Stat. § 134-7(c)(1); Idaho Code Ann. § 18-3302(1)(e); 720 Ill. Comp. Stat. 5/24-3.1(a)(3); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-4204(a)(1); Ky. Rev. Stat. Ann. § 237.110(4)(d), (e); Md. Code Ann., Public Safety, 5-133(b)(4), (5); Mass. Gen. Laws ch. 140, § 129B(1)(iv); Minn. Stat. § 624.713(1)(10)(iii); Mo. Rev. Stat. § 571.070(1)(1); Nev. Rev. Stat. § 202.360(1)(c); N.H. Rev. Stat. Ann. § 159:3(b)(3); N.J. Stat. Ann. § 2C:58-3(c)(2); N.C. Gev. Stat. § 14-404(c)(3); Ohio Rev. Code Ann. § 2923.13(A)(4); R.I. Gen. Laws § 11-47-6; S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7-7.1(3); W. Va. Code § 61-7-7(a)(2), (3).

This shared legislative judgment is amply supported by academic research and empirical studies demonstrating the heightened risk to the public safety posed by the possession of firearms by marijuana users.  According to the Bureau of Justice Statistics, a 2004 survey found that "32% of state prisoners and 26% of federal prisoners said they had committed their current offense while under the influence of drugs."  Bureau of Justice Statistics, *Drugs and Crime Facts*, *available at* http://www.bjs.gov/content/pub/pdf/dcf.pdf [App.  at Tab 5].  Marijuana, moreover, was the most frequent drug of choice: a 2002 survey of convicted jail inmates found that marijuana was the most common drug used at the time of the offense, and similar results were found among probationers.  *Id.*  Moreover, the Office of National Drug Control Policy's ("ONDCP's") arrestee drug abuse monitoring program, which collects data in 10 cities from males 18 years and older at the point of their involvement in the criminal justice system, found that "[m]arijuana was the most commonly detected drug in all of the . . . sites in 2010."  ONDCP, *ADAM II 2010 Annual Report*, at 20 (2010), *available at* http://www.whitehouse.gov/sites/ default/files/ondcp/policyand-research/adam2010.pdf [App.  at Tab 6].  In the ten years that ONDCP has been collecting data, "the proportion of arrestees testing positive for marijuana has never been less than 30 percent of the sample in any of the current 10 sites."  *Id.*  Indeed, "[i]n 2010, in 9 of the 10 sites, 40 percent or more of the arrestees reported [marijuana] use in the prior 30 days."  *Id.* at 22.  This correlation between marijuana use and crime is unsurprising given the well-documented deleterious effects regular marijuana use has on an individual. Marijuana use is associated with impaired cognitive functioning, dependence, mental illness, and poor motor performance.  *See* ONDCP, *Fact Sheet: Marijuana Legalization*, at 1 (Oct.  2010), *available at* http://www.whitehouse.gov/sites/default/files/ondcp/Fact_Sheets/ marijuana_legalization_fact_sheet_3-3-11.pdf [App. at Tab 7].  Marijuana intoxication "can cause distorted perceptions, difficulty in thinking and problem solving," and "[s]tudies have shown an association between chronic marijuana use and increased rates of anxiety, depression, suicidal thoughts, and schizophrenia."  *Id.* at 2; *see also* National Institute of Drug Abuse, *Topics in Brief: Marijuana*, at 1 (Dec.  2011), *available at* https://www.drugabuse.gov/sites/default/ files/marijuana_3.pdf [App.  at Tab 8] (noting that marijuana can have wide-ranging effects,

28

1   including impaired short term memory, slowed reaction time and impaired motor coordination,

2   altered judgment and decision-making, and altered mood); *Id.* at 2 ("Population studies reveal an

3   association between cannabis use and increased risk of schizophrenia and, to a lesser extent,

4   depression and anxiety.").

5         The potential risks posed by the possession of a firearm by someone who uses this mind-

6   altering substance are clear.  Moreover, nothing in these studies indicates that the effects of

7   marijuana that make it dangerous for a user to possess a firearm are somehow mitigated when a

8   doctor has indicated that "use of marijuana may mitigate the symptoms or effects of [a chronic or

9   debilitating medical] condition."  Nev. Rev. Stat. § 453A.210(2)(a)(2).  The documented effects

10   of marijuana use thus corroborate the substantial relationship between § 922(g)(3) and

11   Congress's goal of protecting the public's safety.  *See Yancey*, 621 F.3d at 685 (recognizing that

12   "habitual drug abusers, like the mentally ill, are more likely to have difficulty exercising self-

13   control, making it dangerous for them to possess deadly firearms.").

14         In addition, the limited temporal reach of § 922(g)(3) helps ensure that it bears a

15   reasonable fit to the ends that it serves.  Unlike most of § 922(g)'s other firearm exclusions,

16   which may operate as lifetime bans, § 922(g)(3) only applies to those who are currently unlawful

17   users.  *See* 27 C.F.R. § 478.11 (defining "unlawful user" so that any unlawful use must have

18   "occurred recently enough to indicate that the individual is actively engaged in such conduct").

19   Through this feature, "Congress tailored the prohibition to cover only the time period during

20   which it deemed such persons to be dangerous."  *Carter*, 669 F.3d at 419.  Moreover, §

21   922(g)(3) "enables a drug user who places a high value on the right to bear arms to regain that

22   right by parting ways with illicit drug use."  *Id.*  The choice is the user's, and nothing in the

23   Second Amendment "require[s] Congress to allow [the unlawful user] to simultaneously choose

24   both gun possession and drug abuse."  *Yancey*, 621 F.3d at 687.

25         Given the "substantial deference" afforded to "predictive judgments" made by Congress

26   in order to advance the nation's interests, *Turner Broad. Sys.*, 512 U.S. at 665, these sources

27   demonstrate that § 922(g)(3), as applied to marijuana users, satisfies intermediate scrutiny.  That

28   Plaintiff has registered to use marijuana for purported medical purposes, as opposed to

recreational purposes, does nothing to change the result.  Plaintiff may attempt to argue (and did so in response to Defendants' first Motion to Dismiss) that § 922(g)(3) is unconstitutional as applied to her because she is a responsible marijuana user who poses no genuine threat to public safety.  But such an argument is clearly precluded by the Supreme Court's recognition in *Heller* that "some categorical disqualifications are permissible" and that "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons." *Skoien*, 614 F.3d at 641 (emphasis added); *see also Tooley*, 717 F. Supp. 2d at 597 ("Section 922(g)(9) is of course overbroad in the sense that not every domestic violence misdemeanant who loses his or her right to keep and bear arms would have misused them against a domestic partner or other family member.  Under intermediate scrutiny, however, the fit does not need to be perfect, but only be reasonably tailored in proportion to the important interest it attempts to further.  As such, intermediate scrutiny tolerates laws that are somewhat overinclusive." (citations omitted)).

Nor can Plaintiff succeed on a Second Amendment challenge by "disagree[ing] with Congress' policy decision to link the firearms prohibition in § 922(g)(3) to the Controlled Substances Act." *Carter*, 669 F.3d at 421.  As the Fourth Circuit recognized, "[i]n enacting § 922(g)(3), Congress could have chosen to reexamine the foundations of national drug policy and to identify precisely what kinds of drug users ought to be prohibited from possessing firearms.  Instead, it opted, quite reasonably, to connect § 922(g)(3)'s prohibition on the carefully studied and regularly updated list of substances contained in the Controlled Substances Act." *Id.* Given that § 922(g)(3)'s means need only be reasonably tailored to its ends, this reasonable legislative judgment is entirely consistent with the Second Amendment.

In sum, a variety of sources, including legislative text and history, empirical evidence, case law, and common sense, demonstrate that § 922(g)(3), as applied to marijuana users, substantially relates to the indisputably important government interest in protecting public safety and preventing crime.  It therefore satisfies the requirements of intermediate-scrutiny review.  Consequently, even if the Court deems it necessary to apply a constitutional means-end analysis, Plaintiff's challenge to § 922(g)(3), as interpreted by ATF, must fail.

### B.  18 U.S.C. § 922(d)(3), as Implemented and Interpreted by ATF, Does Not Violate the Second Amendment.

Given that § 922(g)(3) is consistent with the Second Amendment, Plaintiff's challenge to § 922(d)(3) is similarly unavailing.  First, § 922(d)(3)'s restriction is directed toward firearm sellers, not the putative purchaser.  Nothing in *Heller* suggests that the Constitution protects a right to sell firearms; indeed, *Heller*'s language, indicating that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms," strongly suggests otherwise.  554 U.S. at 626–27.  Only one court to date appears to have considered a Second Amendment challenge to § 922(d)(3), and it found that there was no authority indicating that, "at the time of its ratification, the Second Amendment was understood to protect an individual's right to sell a firearm."  *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. Apr. 13, 2011) (unpublished).  Second, the right of "law-abiding, responsible citizens to use arms in defense of hearth and home" that is at the "core" of the Second Amendment, *Heller*, at 634–35, "does not necessarily give rise to a corresponding right to sell a firearm," *Chafin*, 423 F. App'x at 344.

This is not to say that restrictions on the sale of firearms could never implicate Second Amendment concerns.  But § 922(d)(3) cannot not run afoul of the Second Amendment because, for all the reasons discussed above, unlawful drug users who are precluded from acquiring firearms by the statute's operation may constitutionally be prohibited from possessing firearms.  In other words, because § 922(g)(3)'s prohibition of the *possession* of firearms by unlawful drug users is consistent with the Second Amendment, § 922(d)(3)'s prohibition of the *acquisition* of firearms by these same individuals is equally consistent.

### C.  27 C.F.R. § 478.11 Does Not Violate the Second Amendment

Similarly, nothing in the ATF's definition of the term "unlawful user of or addicted to any controlled substance" contained in 27 C.F.R. § 478.11 runs afoul of the Second Amendment.  The regulation survives for all of the reasons that the statutes survive—that is, *Dugan*'s reasoning applies, users of medical marijuana fall outside the historical understanding of the Second Amendment, and the regulation survives intermediate scrutiny.  *See* Parts II.A.-II.B.

31

### D.  The Open Letter Does Not Violate the Second Amendment

Finally, for the same reasons that defeat Plaintiff's Second Amendment challenge to the firearm laws, Plaintiff's challenge to the Open Letter must also fail.  As an initial matter, the Open Letter does not create any "new" restrictions on the possession or sale of firearms, but rather summarizes the interplay between state medical marijuana laws and the applicable federal firearm laws (§ 922(g)(3), § 922(d)(3), and 27 C.F.R. § 478.11).  The Letter restates the existing law and provides guidance to FFLs in their application of the laws to new circumstances.  Accordingly, all of the reasons that support the constitutionality of the firearm laws apply with equal force to the Letter.  *See supra* Parts II.A.-II.C.

Even if the court were to treat the letter as an agency action independent of the statutes and the regulation, it would survive a Second Amendment challenge.  Applying intermediate scrutiny, the Letter is "substantially related to an important government objective."  *Stormans*, 586 F.3d at 1134.   The purpose of the Letter (as with the statutes and the regulation) is the important government interest in protecting public safety and preventing violent crime in general, and in particular, "keeping guns out of the hands of dangerous persons."  *Carter*, 669 F.3d at 417.[20]  Protecting public safety is a "compelling" interest, *Salerno*, 481 U.S. at 748, and is not in any way diminished by the fact that the particular marijuana users addressed by the letter do so in compliance with state law.

The Letter is "substantially related" to that objective for several reasons.  First, the Letter preserves the temporal scope of § 922(g)(3) and § 922(d)(3)—effectively limiting the restriction to cardholders who currently possess a valid card—which several courts have found persuasive in the intermediate scrutiny analysis.  *See Carter*, 669 F.3d at 418; *Yancey*, 621 F.3d at 687.  In order to obtain a firearm, a holder of a medical marijuana registry card need only surrender the

---

[20] To the extent that Plaintiff intends to challenge the policy judgment regarding the use of firearms by marijuana users, as she did earlier in this case, her contentions would be better addressed to Congress, as "[u]nder the system of government created by our Constitution, it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963); *see also Turner Broad. Sys.*, 512 U.S. at 665-66 (noting that "Congress is far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon" complex and dynamic issues).

card.  If the cardholder uses marijuana, then he cannot possess a firearm; if the cardholder does not use marijuana, then he possesses a useless card, and can immediately surrender the card in order to obtain the firearm.  This limiting feature—which is entirely within the individual's control—keeps the prohibitory sweep exceedingly narrow.

Second, ATF's interpretation of the firearm laws expressed in the Letter is reasonable and furthers the underlying goals of the statutes in a sufficiently targeted manner.  Section 922(d)(3) requires that a seller cannot sell a firearm to an individual "knowing *or having reasonable cause to believe*" that the individual is an unlawful user of a controlled substance.  Congress did not define "knowing" or "having reasonable cause to believe."  Reasonable cause "is often proven largely through circumstantial evidence and inferences," *United States v. Jae Gab Kim*, 449 F.3d 933, 943 (9th Cir. 2006) (emphasis omitted), and as used in § 922(d)(3) does not require "actual, subjective knowledge of the purchaser's intended illegal use."  *United States v. Johal*, 428 F.3d 823, 827 (9th Cir. 2005).  Section 478.11 provides that current use can be *inferred* from "evidence of a recent use or possession" or a "pattern of use or possession that reasonably covers the present time[.]"  With that background in mind, possession of a medical marijuana card gives rise to a seller's "reasonable cause to believe" that the potential buyer is a "current user" of marijuana because:  (1) the card is only issued to persons who have a "chronic or debilitating medical condition," Nev. Rev. Stat. § 453A.050, which implies a consistent pattern of use; (2) the cardholder must obtain from her physician documentation stating that the "[t]he medical use of marijuana may mitigate the symptoms or effects of [the patient's] condition" and that "[t]he attending physician has explained the possible risks and benefits of the medical use of marijuana," and then submit that documentation to Nevada, Nev. Rev. Stat. § 453A.210(a)(2)-(3), indicating an intent to use marijuana to alleviate the symptoms of the condition; (3) the card is only valid for one year, Nev. Rev. Stat. § 453A.220(4), which implies recent use; and (4) if the cardholder no longer has the "chronic and debilitating" condition, the cardholder must return the card to the State of Nevada within seven days, Nev. Rev. Stat. § 453A.240, which means that a valid cardholder has an immediate justification for using marijuana (under Nevada law).  For

these reasons, the Letter supports the underlying purpose of § 922(g)(3) and § 922(d)(3).[21]

To the extent that the Open Letter might be considered overinclusive—in the sense that not every possessor of a medical marijuana card will use marijuana and then, under the influence, recklessly use a firearm—intermediate scrutiny does not require a perfect fit.  The fit need only be tailored in proportion to the interest it attempts to further; in other words, intermediate scrutiny tolerates a certain level of overinclusivity.  *See, e.g.*, *Tooley*, 717 F. Supp. 2d at 597 (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 490 (1989)).  This is especially the case with firearm laws, which are necessarily predictive.  *See Kachalsky*, 701 F.3d at 97 ("In the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.") (quoting *Turner Broad. Sys.*, 512 U.S. at 665); *United States v. Miller*, 604 F. Supp. 2d 1162, 1172 (W.D. Tenn. 2009) ("[T]he nature of the threat posed by gun violence makes narrowing the scope of gun regulation impracticable.").  "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable."  *Turner Broad. Sys.*, 512 U.S. at 665.  Congress has made the reasoned judgment that combining firearm possession with marijuana use—*any* marijuana use—will inevitably lead to heightened risk of acts of violence and threats to public safety.  This "predictive judgment" is "accord[ed] substantial deference."  *Id.*; *see also Skoien*, 614 F.3d at 640 ("That some categorical limits are proper is part of the original meaning [of the Second Amendment], leaving to the people's elected representatives the filling in of details.").  The Open Letter furthers that purpose by ensuring that federally-licensed sellers are not

---

[21] Because this is a civil pre-enforcement action brought by plaintiff rather than a criminal prosecution brought by the Government, whether Plaintiff actually uses marijuana is irrelevant for the purposes of Defendants' motion to dismiss.  What *is* relevant is whether it was appropriate for Mr.  Hauseur to rely on Plaintiff's possession of a medical marijuana card in determining that he had "reasonable cause to believe" that Plaintiff was an "unlawful user."  Mr.  Hauesur knew that Plaintiff possessed the card and therefore "refused to sell Ms. Wilson the firearm that she requested on the grounds that she was 'an unlawful user of a controlled substance.'"  FAC Ex. 2, ¶ 13.  That judgment was entirely reasonable, because possession of a card that allows one to use marijuana to treat a chronic condition certainly gives rise to a "reasonable cause to believe" that the person does, in fact, use marijuana.

1  erroneously transferring firearms to certain types of marijuana users, and does so without

2  overextending the scope of the statutes and regulation.

3      Finally, as a more general matter, ATF's interpretation of § 922(g)(3), § 922(d)(3) and 27

4  C.F.R. § 478.11, as set forth in the Open Letter, is entitled to deference under *Skidmore v. Swift &*

5  *Co.*, 323 U.S. 134, 140 (1944).  The Open Letter merely clarifies or explains the law already in

6  existence, and therefore is considered an "interpretative rule."  *See Mora-Meraz v. Thomas*, 601

7  F.3d 933, 939-40 (9th Cir. 2010).[22]  Such interpretations are "entitled to respect" under *Skidmore*,

8  to the extent that it has the "power to persuade."  *Christensen v. Harris County*, 529 U.S. 576,

9  587 (2000).  As noted above, the agency's interpretation is well-considered and reasonable, and

10 should be entitled to *Skidmore* deference.  In addition, the Open Letter also interprets the

11 application of 27 C.F.R. § 478.11, and an agency's interpretation of its own regulation is entitled

12 to deference under *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  *See Price v. Stevedoring Servs. of*

13 *Am., Inc.*, 697 F.3d 820, 828-29 (9th Cir. 2012) ("[S]ubstantial deference must be given to an

14 agency's construction of its own regulations.") (citing *Martin v. Occupational Safety and Health*

15 *Review Comm'n*, 499 U.S. 144, 154-55 (1991)).  For all of these reasons, the Open Letter does

16 not violate the Second Amendment.

17 **III.    PLAINTIFF'S FIRST AMENDMENT RIGHTS HAVE NOT BEEN VIOLATED**

18     Plaintiff's First Amendment claim must also be dismissed.  Plaintiff contends that she has

19 a right to exercise "certain non-verbal and communicative conduct," including the acquisition

20 and possession of a medical marijuana card, and that Defendants actions have deterred her from

21 exercising that right.  FAC ¶ 82, 94.[23]  But this conduct can hardly be considered expressive

22

23 [22] Though Plaintiff alleges in the FAC that the Letter is legislative, not interpretive, FAC ¶ 69, the Letter more accurately falls into the latter category.  For purposes of this case, the distinction

24 is only relevant in determining the amount of deference afforded to the Open Letter.

25 [23] Plaintiff incorrectly suggests that her claim may be considered to be a First Amendment "retaliation claim."  *See* AC ¶ 93-94 (apparently alleging that Defendants retaliated against

26 Plaintiff for her possession of her medical marijuana card).  Such claims typically arise in the retaliatory prosecution or the § 1983 context.  *See, e.g.*, *Lacey v. Maricopa Co.*, 693 F.3d 896

26 (9th Cir. 2012).  Those contexts do not apply here.  Needless to say, Plaintiff has not set forth

27 facts adequate to suggest that the passage of § 922(g)(3), § 922(d)(3), the promulgation of 27 C.F.R. § 478.11, or the distribution of the Open Letter, was motivated by a retaliation for any

28 communicative conduct by Plaintiff.

conduct protected by the First Amendment, and even if it were, any free speech limitation is incidental to the compelling government interests underlying the statutes, the regulation, and the Open Letter.

The Supreme Court has "rejected the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation and internal quotation marks omitted). However, certain conduct "may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (citation and internal quotation marks omitted). Conduct is analyzed as speech under the First Amendment if "[1] [a]n intent to convey a particularized message [is] present, and [2] [whether] the likelihood [is] great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11 (1974).

Under the first of the two *Spence* factors, Plaintiff has not adequately alleged an intent to convey a particularized message through the mere acquisition and possession of her registry card. As a preliminary matter, acquisition or possession of an item does not typically suggest expressive conduct, though the use of that item in a particular context might. For example, acquiring or possessing an American flag or a draft card is not typically conduct that rises to the level of speech. But publicly waving—or burning—the flag or the card could amount to expressive conduct. *See Nordyke v. King*, 319 F.3d 1185, 1190 (9th Cir. 2003) (citing *Johnson*, 491 U.S. at 404-06); *see also Johnston v. Port Authority of New York and New Jersey*, 2011 WL 3235760, at *11 (E.D.N.Y. July 28, 2011) (mere possession of an identification card did not demonstrate an "intent to convey a particularized message"). Plaintiff must show more than mere acquisition or possession of her registry card to bring the conduct into the realm of protected speech.

In a similar vein, Plaintiff has not alleged that the act of acquiring or possessing a card was "conveyed" to any third party. Though she states that she has shared the fact that she has the card "with others," FAC at ¶ 88, that is not sufficient to establish that the acquisition or possession was a communicative act. Moreover, at no point in Plaintiff's declaration does she

contend that she obtained her card in order to convey a particular message. *See generally* FAC Ex. 1.  Rather, Plaintiff states that she suffered from severe and debilitating cramps that could be treated by cannabis, and sought a doctor's recommendation to obtain a medical marijuana registry card. *Id.* at ¶¶ 20-22.  Though Plaintiff alleges in the FAC that she is "expressing her support for and advocacy of legalization of medical marijuana" through acquisition and possession of the card, FAC ¶ 86, that allegation cannot trump the intention of her conduct expressed in her declaration.

As for the second of the *Spence* factors, it is far from likely that a person who learned that Plaintiff possessed a medical marijuana card would understand any political message to be inherent in that conduct.  A person who learned that Plaintiff possessed the registry card would be more likely to assume exactly what Plaintiff set forth in her declaration—that she possesses the card in order to treat a medical condition as allowed under state law—rather than to assume that Plaintiff is an advocate for medical marijuana.

But even if the acquisition and possession of a medical marijuana card did constitute "expressive conduct," Plaintiff's First Amendment claim would fail under the appropriate analysis.  If the "regulation is related to the suppression of free expression"—that is, if it "proscribe[s] particular conduct *because* it has expressive elements"—strict scrutiny applies. *Johnson*, 491 U.S. at 403, 406.  If not, courts apply the less stringent standard from *United States v. O'Brien*, 391 U.S. 367, 377 (1968).  The statute, regulation, and Open Letter were all aimed at reducing the threat caused by gun violence, not at suppressing advocacy of legalization of medical marijuana or any other form of speech.  Accordingly, the *O'Brien* test applies.

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376.  In particular:

> a government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."

*Id.* at 377.  All of these factors are met here.  First, it is indisputable that the United States has the

power to regulate the possession and sale of firearms.  Second, the provisions further the compelling government interest in protecting public safety and preventing violent crime.  Third, that interest is unrelated to suppressing speech.  Finally, to the extent Plaintiff's First Amendment freedoms have been restricted, any restriction would be *de minimis* and would be outweighed by the Government's interest in keeping firearms out of the hands of unlawful drug users.

## IV.   PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM SHOULD BE DISMISSED AS DUPLICATIVE OF HER CLAIMS UNDER THE FIRST AND SECOND AMENDMENTS

Plaintiff previously based her substantive due process claim on a purported fundamental right to use marijuana for medical reasons, which was expressly foreclosed by *Raich v. Gonzales*, 500 F.3d 850, 861-66 (9th Cir. 2007).  In her new complaint, Plaintiff now appears to ground her substantive due process claim in her purported "right to possess a handgun under the Second Amendment" and the "fundamental right to free speech under the First Amendment."  FAC ¶ 77. This latest iteration of her claim fares no better, as any infringement of Plaintiff's First and Second Amendment rights cannot provide the basis for a violation of substantive due process.

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." *Albright v. Oliver*, 510 U.S. 266, 266 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  Accordingly, "if a constitutional claim is covered by a specific constitutional provision . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."  *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997); *Fontana v. Haskin*, 262 F.3d 871, 882 (9th Cir. 2001).  Since Plaintiff appears to base her substantive due process claim on rights protected by the First and Second Amendments, the claim amounts to a retread of her claims alleging violations of these specific amendments, and therefore must be dismissed.  *See Denney v. DEA*, 508 F. Supp. 2d 815, 834 (E.D. Cal. 2007) (dismissing substantive due process claim "[s]ince the First Amendment provides explicit protection for the right to free speech . . . [and therefore] plaintiff may not additionally base a due process claim on a violation of his right to free speech."); *cf. Richards v. Cnty. of Yolo*, 821 F.

1   Supp. 2d 1169, 1177 n.8 (E.D. Cal. 2011) ("Though the right to keep and bear arms for self-

2   defense is a fundamental right, that right is more appropriately analyzed under the Second

3   Amendment.") (citation and internal quotations omitted).

4   **V.    PLAINTIFF'S PROCEDURAL DUE PROCESS MUST BE DISMISSED**
        **BECAUSE SHE HAS NOT BEEN DEPRIVED OF A CONSTITUTIONALLY-**
5       **PROTECTED LIBERTY INTEREST**

6           Plaintiff further claims that Defendants "deprived Plaintiff of her protected liberty

7   interest" in a "right to possess a firearm under the Second Amendment."  Plaintiff fails to state a

8   prima facie case to establish a procedural due process claim, which requires that Plaintiff allege

9   facts showing: "(1) a deprivation of a constitutionally protected liberty or property interest, and

10  (2) a denial of adequate procedural protections."  *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir.

11  2003).

12          Plaintiff's claim cannot survive the threshold inquiry, as she has not been deprived of a

13  constitutionally-protected liberty or property interest.  *See Erickson v. United States*, 67 F.3d 858,

14  861 (9th Cir. 1995) (finding that the guarantee of procedural due process applies only when a

15  constitutionally protected liberty or property interest is at stake).  Plaintiff does not have a

16  constitutional right to use marijuana.  *Raich II*, 500 F.3d 850, 861-66; *see also Marin Alliance for*

17  *Medical Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1157 (2011) ("Finally—and significantly—

18  it is difficult to reconcile the purported existence of a fundamental right to use marijuana for

19  medical reasons with Congress' pronouncement that 'for purposes of the [CSA], marijuana has

20  no currently accepted medical use at all.'" (citing *Oakland Cannabis*, 532 U.S. at 491)).

21  Moreover, as stated, users of marijuana for medical purposes, like all users of controlled

22  substances in violation of federal law, fall outside of the scope of the Second Amendment.

23  Plaintiff, therefore, has not shown that the government has deprived her of any constitutionally-

24  protected liberty or property interest, and the claim must be dismissed.  *See Clark K. v. Willden*,

25  616 F. Supp. 2d 1038, 1041-42 (D. Nev. 2007) (dismissing procedural due process claims where

26  plaintiffs failed to set forth a proper constitutionally-protected interest).

27

28

1   **VI.   PLAINTIFF'S EQUAL PROTECTION MUST BE DISMISSED BECAUSE SHE**
        **HAS NOT IDENTIFIED SIMILARLY SITUATED INDIVIDUALS THAT**
2       **DEFENDANTS HAVE TREATED DIFFERENTLY**

3           Plaintiff's equal protection claim is also meritless.  Plaintiff alleges that §§ 922(g)(3) and

4   922(d)(3), as implemented and interpreted by ATF, violate the equal protection component of the

5   Due Process Clause.  FAC ¶¶ 58-66.  The Equal Protection Clause provides that "[n]o state shall

6   . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const.

7   amend. XIV, § 1.  Although this clause expressly applies only to the States, the Supreme Court

8   has found that its protections are encompassed by the Due Process Clause of the Fifth

9   Amendment and therefore apply to the federal government.  *Bolling v. Sharpe*, 347 U.S. 497

10  (1954).  Congress is presumed to act within its powers when it passes legislation, however, and

11  federal statutes challenged for denial of equal protection are entitled to deferential review as long

12  as the "legislative classification or distinction 'neither burdens a fundamental right nor targets a

13  suspect class.'"  *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (quoting *Romer v. Evans*, 517 U.S.

14  620, 631 (1996)).

15          In evaluating an equal protection challenge, a court must first determine whether a

16  plaintiff is being treated differently from similarly situated individuals.  *Gonzalez-Medina v.*

17  *Holder*, 641 F.3d 333, 336 (9th Cir. 2011).  The equal protection component of the Due Process

18  Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City*

19  *of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  As a result, "[t]o establish

20  an equal protection violation, [the plaintiff] must show that she is being treated differently from

21  similarly situated individuals."  *Gonzalez-Medina*, 641 F.3d at 336.

22          Plaintiff first claims that she is similarly situated to "persons who are prescribed medical

23  marijuana in states where the obtainment of a state-issued medical marijuana card is not

24  required."  FAC ¶ 62.  According to Plaintiff, because some states allow medical marijuana use

25  without issuing registry identification cards, those medical marijuana users will be able to buy

26  firearms more easily than people who live in states that require medical marijuana registry cards.

27  *Id.*  This claim cannot proceed.  As a threshold matter, Plaintiff has not supported these

28  conclusory allegations with any facts regarding the supposed (easier) registration requirements in

other states. *See Marin Alliance For Medical Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1158-59 (N.D. Cal. 2011) (rejecting equal protection claim where, *inter alia*, Plaintiff failed to present facts supporting allegations regarding differences in state medical marijuana laws).

In any event, even if Plaintiff could overcome this pleading defect, the claim would still fail. Plaintiff does not claim (because she cannot) that the "law is applied in a discriminatory manner or imposes different burdens on different classes of people." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995). The law applies equally to all users of medical marijuana, and nothing in § 922(g)(3), 27 C.F.R. § 478.11, or the Open Letter suggests otherwise. Instead, Plaintiff's argument is that medical marijuana users in certain states may more easily evade the law by purchasing firearms without notifying sellers that they use marijuana. This is not a proper equal protection claim, as the law facially applies to every marijuana user, even if some people are able—through deceit or fraud—to avoid prosecution or obtain a firearm. *See United States v. Hendrickson*, 664 F. Supp. 2d 793, 798 (E.D. Mich. 2009) ("There is no right under the Constitution to have the law go unenforced against you, even if you are the first person against whom it is enforced . . . . The law does not need to be enforced everywhere to be legitimately enforced somewhere." (internal quotation omitted)).[24]

Plaintiff also claims that she is "being treated differently from similarly situated persons with similar medical conditions to those of the Plaintiff." FAC ¶ 63. According to Plaintiff, individuals who pursue methods of treatment other than the use of marijuana "have not been denied their ability to obtain handguns." *Id.* But the class of citizens that use marijuana pursuant to state law are not similarly situated to law-abiding individuals, including those who seek treatment in compliance with federal law. It is entirely reasonable for the government to infer that those individuals who have affirmatively registered to use marijuana on the basis of chronic medical conditions are, in fact, marijuana users. And because all users of marijuana are violating federal law, they are not similarly situated to those citizens who seek medical treatment in a

---

[24] Furthermore, a marijuana registration card is only one of many pieces of evidence that an FFL located in any state can consider in determining whether a particular buyer is an "unlawful user of or addicted to a controlled substance," regardless of the state in which the sale takes place. *Id.*

manner that does not violate federal law.  *See Marin Alliance*, 866 F. Supp. 2d at 1158-59

(finding that individuals whose drug use violates the Controlled Substances Act are not similarly

situated to those whose use is permitted by that law).  Because Plaintiff does not adequately

allege that she has been "treated differently from similarly situated individuals," *Gonzalez-*

*Medina*, 641 F.3d at 336, she fails to state an equal protection claim.[25]

## VII.   AS PLAINTIFF PREVIOUSLY CONCEDED, SHE CANNOT SEEK MONETARY DAMAGES AGAINST THE UNITED STATES

Plaintiff's First Amended Complaint purports to seek claims against the United States for

monetary relief, even though Plaintiff previously conceded that claims for damages cannot

proceed.  *See* FAC  ¶¶ 56, 65, 72, 79, 96 (alleging that Plaintiff has suffered damages "[a]s a

direct and proximate result" of Defendants' actions); Prayer for Relief ¶ 6 (seeking an award of

"compensatory and punitive damages").

The waiver of sovereign immunity claimed by Plaintiff does not apply to actions for

money damages.  The United States, as a sovereign, is immune from suit unless it has waived its

immunity.  *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999); *Levin v. United States*, 663

F.3d 1059, 1061 (9th Cir. 2011).  The United States has not waived its sovereign immunity for

damages claims based on constitutional violations.  *See Dyer v. United States*, 166 F. App'x 908,

909 (9th Cir. 2006) ("To the extent [plaintiff] sought damages from the United States for

allegedly violating his constitutional rights, his claim was barred by sovereign immunity.").  "A

waiver of the Federal Government's sovereign immunity must be unequivocally expressed in

statutory text."  *Lane v. Peña*, 518 U.S. 187, 192 (1996).

---

[25] Even if Plaintiff could establish that she is being treated differently from other similarly-situated individuals, her equal protection claim would still fail because she cannot show that Defendants' actions were irrational.  Because the purported classifications do not target a suspect class, only rational basis would apply.  *Romer*, 517 U.S. at 631.  Under rational basis review, a law must be rationally related to the furtherance of a legitimate governmental interest.  *Id.*  As explained above, the challenged government actions satisfy the requirements of intermediate scrutiny.  *See supra* Part II.A.3.  By definition, then, they also satisfy the more relaxed standards of rational basis review.  *See Dearth v. Holder*, --- F. Supp. 2d ----, 2012 WL 4458447, at *12 (D.D.C. Sep. 12, 2012) (finding that because the challenged restriction survived a Second Amendment challenge under intermediate scrutiny, the restriction also survived an equal protection challenge under rational basis review).

Plaintiff seeks to avail herself of the waiver of sovereign immunity contained in Section 702 of the Administrative Procedure Act. FAC ¶ 11 (alleging that the United States "is a proper defendant in this action pursuant to 5 U.S.C. § 702"). But this waiver only applies to constitutional claims for non-monetary relief. *See* 5 U.S.C. § 702 ("An action in a court of the United States seeking relief *other than monetary damages* . . ." (emphasis added)). Plaintiff previously conceded that she could not seek money damages against the United States. *See* Reply to Def. Mot. to Dismiss (Dkt. 17) at 25 ("To the extent that the Prayer for Relief contained in Plaintiff's Complaint seeks monetary damages, Plaintiff agrees that 5 U.S.C. § 702 does not provide for such damages."). Accordingly, any claims seeking monetary relief from the United States, ATF, or the individual defendants in their official capacity must be dismissed.

## CONCLUSION

For the reasons stated herein, Plaintiff's First Amended Complaint should be dismissed in its entirety, or, in the alternative, summary judgment should be entered in the favor of the United States on all of Plaintiff's claims.

Dated: January 31, 2013          Respectfully submitted,

STUART F. DELERY
Principal Deputy Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney

DIANE KELLEHER
Assistant Director

*/s/ John K. Theis*
JOHN K. THEIS
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

*Attorneys for Defendants*